**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| PANOS TSOLAINOS,<br>Petitioner,<br>v.<br>BURL CAIN,<br>Respondent. | Civil Action No. _________ |

# PETITION FOR A WRIT OF HABEAS CORPUS


Robert C. Stern (#12454)
*Trial Attorney*
KILLEEN & STERN, PC
400 Poydras Street, Suite 1710
New Orleans, Louisiana 70130
TEL: 504.525.8111
FAX: 504.680.6080

Andrew G. McBride
William S. Consovoy
Brendan J. Morrissey
Brett A. Shumate
WILEY REIN LLP
1776 K Street, N.W.
Washington, DC 20006
TEL: 202.719.7000
FAX: 202.719.7049


Dated: October 8, 2010

*Attorneys for Panos Tsolainos*

# TABLE OF CONTENTS

**PAGE**


I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 7

A. Panos and Deborah Tsolainos ........ 7

B. The Alleged Conspiracy ........ 8

C. Deborah Tsolainos's Death ........ 9

D. Pretrial Publicity ........ 11

E. Pretrial Proceedings ........ 16

F. Murder Trial ........ 18

1. The State's Evidence ........ 18

2. The Defense's Evidence ........ 21

3. The State's Rebuttal Evidence ........ 23

G. Perjury ........ 27

H. Direct Appeal ........ 28

I. State Post-Conviction Proceedings ........ 29

III. THE COURT SHOULD EQUITABLY TOLL AEDPA'S ONE-YEAR STATUTE OF LIMITATIONS AND CONSIDER THE PETITION TO BE TIMELY. ........ 34

A. The Facts Underlying Mr. Tsolainos's Former Counsel's Failure to Timely File His Federal Habeas Corpus Petition Constitute an Extraordinary Circumstance Warranting Equitable Tolling ........ 36

B. Mr. Tsolainos Exercised Reasonable Diligence in Acting to Preserve His Rights ........ 42

IV. CLAIMS FOR RELIEF ........ 44

A. The Trial Court Violated Mr. Tsolainos's Sixth Amendment Right to Confront the Witnesses Against Him by Admitting a Confidential Informant's Out-Of-Court Testimony ........ 45

1. The Trial Court Violated the Confrontation Clause by Admitting Mr. Schmolke's Tape-Recorded Testimony to Detective Artigue. ........ 48

2. The Trial Court Violated the Confrontation Clause by Allowing Detective Scallan to Repeat Mr. Schmolke's Out-Of-Court Statements ........ 51

3. The Trial Court Violated the Confrontation Clause by Admitting Mr. Schmolke's Tape-Recorded Statements to Mr. Branigan ........ 53

B. Mr. Tsolainos Was Denied a Fair Trial by an Impartial Jury ........ 58

1. Pretrial Publicity of Mr. Tsolainos's Conspiracy and Murder Arrests Created a Presumption of Juror Prejudice ........ 58

2. Actual Prejudice Infected Mr. Tsolainos's Jury ........ 65

C. The State Violated Mr. Tsolainos's Due Process Rights by Knowingly Using False Testimony ........ 69

1. The Trial Was Infected With False Testimony. ........ 70

2. The False Testimony Was Material ........ 74

3. The Prosecution Knew or Should Have Known of the False Testimony ........ 77

D. The Admission of Testimony Concerning Prior Drug Use Violated Mr. Tsolainos's Fifth and Sixth Amendment Rights ........ 79

1. The Testimony of Doctors Thompson and Salcedo on the Issue of Mr. Tsolainos's History of Drug Use Violated His Fifth Amendment Rights ........ 81

2. The State's Failure to Provide Counsel With Notice of How the Examination of Mr. Tsolainos Would Be Used Violated Mr. Tsolainos's Sixth Amendment Rights. ........ 84

E. The Cumulative Impact of the Trial Court's Errors Deprived Mr. Tsolainos of His Due Process Right to a Fair Trial ........ 85

F. Conviction by a 10-2 Verdict Violated Mr. Tsolainos's Sixth Amendment Right to a Unanimous Verdict in a Criminal Trial. ........ 87

V. RELIEF REQUESTED ........ 89

APPENDIX A (Declaration of Panos Tsolainos)

APPENDIX B (Declaration of John Vagelos)

APPENDIX C (*State v. Tsolainos*, No. 2000 KA 1664, 864 So. 2d 905 (La. Ct. App. 2003))

APPENDIX D (*State v. Tsolainos*, No. 2007 KW 2443, 997 So. 2d 46 (La. Ct. App. 2008))

## TABLE OF AUTHORITIES

**CASES** **PAGE**

*Agostini v. Felton*,
521 U.S. 203 (1997) ....................................................................................87

*Ainsworth v. Calderon*,
138 F.3d 787 (9th Cir. 1998) ......................................................................61

*Alcala v. Woodford*,
334 F.3d 862 (9th Cir. 2003) ......................................................................86

*Andres v. United States*,
333 U.S. 740 (1948) ....................................................................................88

*Apodaca v. Oregon*,
406 U.S. 404 (1972) ........................................................................ 6, 87-88

*Austin v. McKaskle*,
724 F.2d 1153 (5th Cir. 1984) ....................................................................78

*Baldayaque v. United States*,
338 F.3d 145 (2d Cir. 2003)........................................................................40

*Barrientes v. Johnson*,
221 F.3d 741 (5th Cir. 2000) ......................................................................74

*Bourjaily v. United States*,
483 U.S. 171 (1987)....................................................................................46

*Burbank v. Cain*,
535 F.3d 350 (5th Cir. 2008) ......................................................................45

*Carty v. Thaler*,
583 F.3d 244 (5th Cir. 2009) ................................................................44, 50

*Chambers v. Johnson*,
218 F.3d 360 (5th Cir. 2000) ......................................................................76

*Coleman v. Kemp*,
778 F.2d 1487 (11th Cir. 1985) ..................................................................61

*Cordle v. Guarino*,
428 F.3d 46 (1st Cir. 2005).........................................................................38

*Crawford v. Washington*,
541 U.S. 36 (2004) ........ *passim*

*Danforth v. Minnesota*,
552 U.S. 264 (2008) ........ 45

*Daniels v. Woodford*,
428 F.3d 1181 (9th Cir. 2005) ........ 63, 66

*Davis v. Johnson*,
158 F.3d 806 (5th Cir. 1998) ........ 35

*Davis v. Washington*,
547 U.S. 813 (2006) ........ 46, 49, 52, 56

*Derden v. McNeel*,
978 F.2d 1453 (5th Cir. 1992) ........ *passim*

*Downs v. McNeil*,
520 F.3d 1311 (11th Cir. 2008) ........ 40

*Estelle v. Smith*,
451 U.S. 454 (1981) ........ *passim*

*Ferguson v. Palmateer*,
321 F.3d 820 (9th Cir. 2003) ........ 38

*Fierro v. Cockrell*,
294 F.3d 674 (5th Cir. 2002) ........ 36

*Fisher v. Gibson*,
262 F.3d 1135 (10th Cir. 2001) ........ 39

*Gardner v. Johnson*,
247 F.3d 551 (5th Cir. 2001) ........ 82

*Giglio v. United States*,
405 U.S. 150 (1972) ........ 4, 69, 73, 78

*Griffith v. Kentucky*,
479 U.S. 314 (1987) ........ 44

*Hale v. United States*,
435 F.2d 737 (5th Cir. 1970) ........ 61

*Hampton v. Wilkinson*,
No. 08-1535, 2008 WL 4829716 (E.D. La. Aug. 26, 2008) ....................................... 34

*Hawaii v. Mankichi*,
190 U.S. 197 (1903) ....................................................................................... 88

*Holland v. Florida*,
130 S. Ct. 2549 (2010) .............................................................................. *passim*

*Irvin v. Dowd*,
366 U.S. 717 (1961) .................................................................... 3, 57, 63, 66

*Irwin v. Department of Veterans Affairs*,
498 U.S. 89 (1990) ......................................................................................... 35

*Jackson v. Brown*,
513 F.3d 1057 (9th Cir. 2008) ....................................................................... 77

*Jimenez v. Quarterman*,
129 S. Ct. 681 (2009) ...................................................................................... 33

*Johnson v. Hendricks*,
314 F.3d 159 (3d Cir. 2002) ........................................................................... 38

*Johnson v. Louisiana*,
406 U.S. 366 (1972) ....................................................................................... 87

*Jones v. Cain*,
600 F.3d 527 (5th Cir. 2010) .................................................................. 44, 48

*Killian v. Poole*,
282 F.3d 1204 (9th Cir. 2002) ....................................................................... 86

*Knox v. Johnson*,
224 F.3d 470 (5th Cir. 2000) ......................................................................... 69

*Lave v. Dretke*,
444 F.3d 333 (5th Cir. 2006) ......................................................................... 45

*Lawrence v. Florida*,
127 S. Ct. 1079 (2007) .................................................................................... 35

*Leake v. Senkowski*,
274 F. Supp. 2d 588 (S.D.N.Y. 2003) ............................................................ 39

*In re Liljeberg Enters., Inc.*,
304 F.3d 410 (5th Cir. 2002) ....................88

*Lonchar v. Thomas*,
517 U.S. 314 (1996)....................43

*Magee v. Cain*,
No. 99-3867, 2000 WL 1023423 (E.D. La. July 24, 2000) ....................34

*Malloy v. Hogan*,
378 U.S. 1 (1964) ....................88

*Maness v. Meyers*,
419 U.S. 449 (1975)....................84

*Mark v. Michael*,
No. 08-1261, 2008 WL 4365929 (E.D. La. Sept. 23, 2008)....................34

*Mathis v. Thaler*,
No. 08-70021, 2010 WL 3278609 (5th Cir. Aug. 20, 2010) ....................35, 43

*McDonald v. City of Chicago*,
130 S. Ct. 3020 (2010) ....................6, 88

*McGuinness v. Pepe*,
150 F. Supp. 2d 227 (D. Mass. 2001) ....................39

*Miller-El v. Cockrell*,
537 U.S. 322 (2003)....................44

*Moore v. Knight*,
368 F.3d 936 (7th Cir. 2004) ....................42

*Morris v. Dretke*,
413 F.3d 484 (5th Cir. 2005) ....................85

*Morris v. Ylst*,
447 F.3d 735 (9th Cir. 2006) ....................77, 78

*In re Murchison*,
349 U.S. 133 (1955)....................57

*Murphy v. Florida*,
421 U.S. 794 (1975)....................63

*N. Mariana Islands v. Bowie*,
243 F.3d 1109 (9th Cir. 2001) ....................................................................77, 78

*Napue v. Illinois*,
360 U.S. 264 (1959)...........................................................................4, 68, 75

*Neal v. Bock*,
137 F. Supp. 2d 879 (E.D. Mich. 2001)...................................................................39

*Ohio v. Roberts*,
448 U.S. 56 (1980)...........................................................................................45

*Parker v. Gladden*,
385 U.S. 363 (1966).........................................................................................65

*Parker v. Randolph*,
442 U.S. 62 (1979)...........................................................................................58

*Patton v. Yount*,
467 U.S. 1025 (1984)........................................................................4, 63, 65

*Pearson v. North Carolina*,
130 F. Supp. 2d 742 (W.D.N.C. 2001) .............................................................39

*Phillips v. Donnelly*,
216 F.3d 508 (5th Cir. 2000) .............................................................................43

*Porter v. Estelle*,
709 F.2d 944 (5th Cir. 1983) .............................................................................80

*Powell v. Quarterman*,
536 F.3d 325 (5th Cir. 2008) .............................................................................80

*Powell v. Texas*,
492 U.S. 680 (1989).........................................................................................84

*Rideau v. Louisiana*,
373 U.S. 723 (1963)..................................................................... 3, 59-61, 63

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
490 U.S. 477 (1989) ........................................................................................87

*Scott v. Johnson*,
227 F.3d 260 (5th Cir. 2000) ........................................................................34, 38

*Sheppard v. Maxwell*,
384 U.S. 333 (1966)....62, 66

*Skilling v. United States*,
130 S. Ct. 2896 (2010).... *passim*

*Smith v. McGinnis*,
208 F.3d 13 (2d Cir. 2000)....38

*Sorce v. Artuz*,
73 F. Supp. 2d 292 (E.D.N.Y. 1999) ....39

*Spitsyn v. Moore*,
345 F.3d 796 (9th Cir. 2003) ....40

*Starns v. Andrews*,
524 F.3d 612 (5th Cir. 2008) ....42

*State v. Bertrand*,
6 So. 3d 738 (La. 2009) ....87

*State v. Kihnel*,
488 So. 2d 1238 (La. Ct. App. 1986)....46

*State v. Tsolainos*,
No. 99-2885, 748 So. 2d 457 (1999) ....17, 18

*State v. Tsolainos*,
No. 2000 KA 1664, 864 So. 2d 905 (La. Ct. App. 2003).... *passim*

*State v. Tsolainos*,
No. 2004-K-0616, 877 So. 2d 144 (La. 2004)....28

*State v. Tsolainos*,
No. 2007 KW 2443, 997 So. 2d 46 (La. Ct. App. 2008) .... *passim*

*State v. Tsolainos,*
No. 2008-KP-2653, 19 So. 3d 6 (La. 2009)....30

*State v. Watts*,
835 So. 2d 441 (La. 2003) ....69

*Taylor v. Cain*,
545 F.3d 327 (5th Cir. 2008) ....52

*Tinker v. Moore*,
255 F.3d 1331 (11th Cir. 2001) ....................................................................39

*Towles v. Dretke*,
No. 403CV822Y, 2003 WL 22952820 (N.D. Tex. Dec. 10, 2003)............................36

*Tsolainos v. Louisiana*,
No. 04-450, 543 U.S. 1186 (2005)....................................................................28

*Turner v. Quarterman*,
481 F.3d 292 (5th Cir. 2007) ..........................................................................85

*United States v. Bader*,
956 F.2d 708 (7th Cir. 1992) ..........................................................................77

*United States v. Barham*,
595 F.2d 231 (5th Cir. 1979) ..............................................................69, 73, 74, 76

*United States v. Bell*,
367 F.3d 452 (5th Cir. 2004) ..........................................................................85

*United States v. Chagra*,
669 F.2d 241 (5th Cir. 1982) ...................................................................... *passim*

*United States v. Cromer*,
389 F.3d 662 (6th Cir. 2004) ..........................................................46, 49, 50

*United States v. Frederick*,
78 F.3d 1370 (9th Cir. 1996) ..........................................................................85

*United States v. Gonzales*,
436 F.3d 560 (5th Cir. 2006) ......................................................................68, 74

*United States v. Hendricks*,
395 F.3d 173 (3d Cir. 2005)........................................................................56, 57

*United States v. Holmes,*
--- F.3d -- 2010 WL 3431830 (8th Cir. Sept. 2, 2010) ..............................................46

*United States v. Leonard*,
609 F.2d 1163 (5th Cir. 1980) ........................................................................81

*United States v. Lopez-Medina*,
596 F.3d 716 (10th Cir. 2010) ........................................................................46

*United States v. Martin*,
408 F.3d 1089 (8th Cir. 2005) ....................................................................40, 41

*United States v. Martinez-Salazar*,
528 U.S. 304 (2000)........................................................................................65

*United States v. Mason*,
293 F.3d 826 (5th Cir. 2002) ..........................................................................76

*United States v. O'Keefe*,
128 F.3d 885 (5th Cir. 1997) ..........................................................................75

*United States v. Rodriguez-Martinez*,
480 F.3d 303 (5th Cir. 2007) ..........................................................................47

*United States v. Scott*,
854 F.2d 697 (5th Cir. 1988) ..........................................................................67

*United States v. Silva*,
380 F.3d 1018 (7th Cir. 2004) ....................................................................51, 52

*United States v. Stalnaker*,
571 F.3d 428 (5th Cir. 2009) ..........................................................................85

*United States v. Wynn*,
292 F.3d 226 (5th Cir. 2002) ......................................................................36, 41

*Vanderbilt v. Collins*,
994 F.2d 189 (5th Cir. 1993) ......................................................................81, 84

*Vasquez v. United States*,
No. 09-CIV-3845, 2010 WL 3304256 (S.D.N.Y. Aug. 19, 2010) ..............................40

*Vineyard v. Dretke*,
125 F. App'x 551 (5th Cir. 2005) ...............................................................36, 41

*Williams v. Cain*,
No. 00-536, 2000 WL 863132 (E.D. La. June 27, 2000)...........................................34

*Williams v. Cain*,
217 F.3d 303 (5th Cir. 2000) ..........................................................................38

*Williams v. Taylor*,
529 U.S. 362 (2000)........................................................................................44

*Williams v. Warden, David Wade Correction Center*,
No. 09-0817, 2009 WL 2849571 (W.D. La. Sept. 3, 2009) ....................................38

*Wims v. United States*,
225 F.3d 186 (2d Cir. 2000)....................................................................................42

*Wion v. Quarterman*,
567 F.3d 146 (5th Cir. 2009) ...................................................................................38

**STATUTES AND CONSTITUTIONAL PROVISIONS**

28 U.S.C. § 2241(d) ........................................................................................1

28 U.S.C. § 2244(d)(1) ...................................................................................33

28 U.S.C. § 2244(d)(1)(A).................................................................................33

28 U.S.C. § 2244(d)(2) ...................................................................................33

28 U.S.C. § 2254...............................................................................................1

28 U.S.C. § 2254(b)(1)(A).................................................................................37

28 U.S.C. § 2254(d) .........................................................................................44

La. Code Crim. Proc. Ann. Art. 930.8(A)..........................................................34

La. Const. art. I, § 17 .......................................................................................87

La. Rev. Stat. Ann. § 14:30.1............................................................................15

Or. Const. art. I, § 11 .......................................................................................87

U.S. Const. amend. VI .....................................................................................44

**MISCELLANEOUS**

7 Criminal Procedure § 28.5(b) (3d ed. 2009).......................................................38

16A Federal Procedure, Lawyers Edition § 41:350 (2010) ......................................38

Brian R. Means, Federal Habeas Manual § 9A:5 (2010)..........................................38

# I. INTRODUCTION

Panos Tsolainos (D.O.C. 426467) ("Petitioner" or "Mr. Tsolainos") respectfully submits this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This Court has jurisdiction over the petition because Mr. Tsolainos is currently being held in the custody of Respondent Burl Cain ("Respondent") at the Louisiana State Penitentiary at Angola in violation of the Constitution of the United States. Venue is proper in this Court because Mr. Tsolainos was convicted and sentenced in a state court within this judicial district. 28 U.S.C. § 2241(d). Petitioner respectfully requests that this Court order Respondent to show cause why the writ should not be granted and thereafter grant the petition, vacate the conviction, and order Respondent to release Mr. Tsolainos from custody.

In 1998, Mr. Tsolainos was charged with second-degree murder in the death of Deborah Tsolainos, his ex-wife. At trial, the State argued that Mr. Tsolainos intentionally struck Deborah with an automobile; Mr. Tsolainos contended that it was an accident and, therefore, he did not harbor any specific intent to kill. On October 23, 1999, by a 10-2 vote, the jury convicted Mr. Tsolainos of second-degree murder. On April 26, 2000, he was sentenced to life in prison without possibility of parole. On December 31, 2003, the Court of Appeals of Louisiana, First Circuit, overruled Mr. Tsolainos's assignments of error; and the Louisiana Supreme Court denied his Application for Supervisory Writ of Review on July 2, 2004. On February 28, 2005, the Supreme Court of the United States denied a petition for a writ of certiorari. Mr. Tsolainos's petition for state post-conviction relief was filed on July 5, 2006, and was later denied by the St. Tammany Parish district court. On October 10, 2008, the First Circuit affirmed that decision, and the Louisiana Supreme Court denied Mr. Tsolainos's Application for a Supervisory Writ of Review on October 9, 2009. This petition followed. As described below, four constitutional errors warrant granting Mr. Tsolainos's federal habeas corpus petition.

As a threshold matter, Mr. Tsolainos's habeas petition is timely under the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Although the petition has been filed after the expiration of AEDPA's one-year limitations period, that period should be equitably tolled under *Holland v. Florida*, 130 S. Ct. 2549 (2010). The facts of this case show that "extraordinary circumstances" led to the petition being untimely. In particular, the petition is untimely because Mr. Tsolainos's prior attorneys were grossly negligent in failing to perform the basic research necessary to understand that the filing of a petition for post-conviction relief in state court suspends—but does not reset—AEDPA's one-year limitations period. Therefore, in order to preserve Mr. Tsolainos's ability to pursue habeas corpus relief in federal court, his state habeas petition needed to be filed within one year of his conviction becoming final. This type of fundamental legal error fits comfortably within the standard for gross negligence established by the Supreme Court in *Holland*.

But the extraordinary circumstances in this case go far beyond prior counsel's failure to comprehend the basic operation of the statutory scheme. Despite Mr. Tsolainos's attempts to closely monitor the progress of his appeal, he encountered significant problems communicating with prior counsel and, even when he did reach them, Mr. Tsolainos was merely given token assurances that everything was proceeding according to plan. As he recently discovered, however, Mr. Tsolainos had been misled into believing that a federal habeas corpus petition was being prepared on his behalf and that it was due on October 9, 2010, only to find out that the petition was already late and that no federal habeas petition had ever been drafted. The doctrine of equitable tolling exists to remedy a situation such as this where prior counsel has jeopardized Mr. Tsolainos's ability to raise meritorious constitutional challenges to a conviction that has resulted in a sentence of life imprisonment without the possibility of parole.

On the merits, Mr. Tsolainos is clearly entitled habeas relief. *First*, the trial court violated Mr. Tsolainos's Sixth Amendment right to confront the witnesses against him at trial. Specifically, the trial court admitted the out-of-court statements of a dead confidential informant, Charles Schmolke, to prove that Mr. Tsolainos's had specific intent to kill his ex-wife based on his alleged involvement in an earlier conspiracy to murder her. Under *Crawford v. Washington*, 541 U.S. 36 (2004), however, the Confrontation Clause allows the admission of "testimonial" statements of absent witnesses "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine," *id.* at 59. Here, Mr. Schmolke's statements indisputably were "testimonial" as they involved statements that he made when wearing a wire for the Sheriff's Office to procure damaging evidence against Mr. Tsolainos; he was unavailable for cross-examination at trial; and Mr. Tsolainos had no prior opportunity to cross-examine Mr. Schmolke. The Louisiana courts unreasonably applied clearly established federal law when they failed to correct this obvious constitutional error.

*Second*, Mr. Tsolainos was denied a fair trial by an impartial jury. *See Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). The media's saturation of St. Tammany Parish with coverage of Mr. Tsolainos's case created a presumption of juror prejudice. This small community was barraged—from the first reports of the alleged conspiracy through the start of trial—with press coverage that Mr. Tsolainos had hired a hitman to kill his ex-wife and, upon being released on bond, had run her down in front of his children. The jury pool was exposed to inflammatory editorials, sensationalized stories of the alleged crimes, and salacious coverage of Mr. Tsolainos's personal life. The continuous stories of Mr. Tsolainos's alleged confessions was particularly damaging; after repeatedly hearing that Mr. Tsolainos had confessed to these crimes, no juror could have impartially considered Mr.

Tsolainos's claim that his ex-wife's death was an accident. Jury *voir dire* confirmed the biased coverage of the case. Almost 90% of the prospective jurors had heard of the case, and *all twelve* jurors had been exposed to pretrial media coverage. Although the empanelled jurors claimed they could be impartial, their assurances were not believable given the welter of adverse pretrial publicity. *Patton v. Yount*, 467 U.S. 1025, 1031 (1984). As a result, the Louisiana courts unreasonably applied clearly established federal law by concluding that Mr. Tsolainos received a fair trial by an impartial jury.

*Third*, the State violated Mr. Tsolainos's Due Process rights by using testimony at trial it knew or should have known to be false. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Giglio v. United States*, 405 U.S. 150, 153 (1972). Mr. Tsolainos's adopted daughter, Clarissa, and her friend George Deforrest both testified at trial that Deborah had not been drinking on the day of the incident. Mr. Deforrest further testified that Mr. Tsolainos stated after the incident that the "fucking bitch got what she deserved, she shouldn't have been running her fucking mouth off." Clarissa later confessed that she had bribed Mr. Deforrest to lie on the stand. She also admitted that she and Mr. Deforrest had lied about Deborah Tsolainos's alcohol consumption on the day of the incident. These lies were clearly material to the jury's verdict. Indeed, the trial court described Mr. Deforrest's testimony as the "most damaging testimony or piece of evidence" offered at trial against Mr. Tsolainos. And, the prosecution had ample reason to doubt the veracity of this testimony yet nevertheless used it to obtain a conviction in this case. The Louisiana courts thus unreasonably applied clearly established federal law by failing to correct this constitutional error.

*Fourth*, the trial court admitted the testimony of two court-appointed doctors concerning Mr. Tsolainos's past drug use in violation of his Fifth and Sixth Amendments rights under

*Estelle v. Smith*, 451 U.S. 454 (1981). Here, as in *Estelle*, the Fifth Amendment is directly implicated because the adverse testimony was introduced through court-appointed doctors who had examined Mr. Tsolainos for the limited purpose of determining his competency to stand trial, and because he was not warned that disclosures made during the examination could be used as evidence against him. The Fifth Amendment clearly forbade the introduction of Mr. Tsolainos's statements unless these doctors had informed him before the examination that any disclosures he might make could be used against him at trial. Because no such warning was given here, Mr. Tsolainos's Fifth Amendment rights were violated.

Mr. Tsolainos's Sixth Amendment rights were violated for the same reason: defense counsel was not informed of the uses to which the examinations could be put and Mr. Tsolainos thus was denied the right to consult with counsel as to the possible ramifications of his participation. Moreover, neither Mr. Tsolainos nor his counsel was ever warned that the prosecution would have access to the doctors' notes and findings and that the doctors themselves might testify about statements Mr. Tsolainos made during the examinations. Under *Estelle*, therefore, the Louisiana courts unreasonably applied clearly established federal law by failing to find that Mr. Tsolainos's Sixth Amendment rights were violated.

*Fifth*, these constitutional errors cumulatively so infected the trial with unfairness as to render Mr. Tsolainos's conviction a denial of due process. *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992) (en banc). The 10-2 conviction rests upon admittedly false testimony, damaging out-of-court statements concerning a conspiracy that should never have been admitted, and was rendered by a jury infected by highly prejudicial pretrial publicity convicting Mr. Tsolainos of murdering his ex-wife before the trial was even held. Correcting these trial errors would make it impossible for a fair and impartial jury to convict Mr. Tsolainos of intentionally

killing his ex-wife because, without this evidence, the State would have been unable to prove beyond a reasonable doubt that Mr. Tsolainos acted with specific intent. Indeed, even relying on this unconstitutional evidence, the State was only able to obtain a conviction because Louisiana allows for non-unanimous jury verdicts in criminal cases.

*Sixth*, and last, the State violated Mr. Tsolainos's Sixth Amendment rights by convicting him of second-degree murder despite the lack of a unanimous jury verdict. Although Louisiana's system, which allowed Mr. Tsolainos's to be convicted by a vote of 10-2, has previously been upheld as constitutional, *see Apodaca v. Oregon*, 406 U.S. 404 (1972), the Supreme Court recently made clear that Sixth Amendment rights have the same force in state criminal prosecutions as in federal criminal prosecutions, *see McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010). It is bedrock law that the Sixth Amendment requires unanimity to convict a defendant of a felony in federal court. Consequently, Mr. Tsolainos's conviction was obtained in violation of the Sixth Amendment.

In sum, Mr. Tsolainos has now served over ten years of a life sentence for a second-degree murder conviction resting on admittedly false testimony given at a trial that should never have been held in St. Tammany Parish in the first place. From the outset of this prosecution, the jury pool was saturated with a constant barrage of media coverage declaring Mr. Tsolainos guilty of hiring a hitman to murder his ex-wife Deborah and killing her by running her over with a car. And when the case proceeded to trial, the State obtained a conviction by relying on unconstitutional evidence and perjured testimony. In particular, the State proved specific intent to kill by using the out-of-court statements of a dead confidential informant acting on the belief that he would be paid for "results" by the Sheriff's Office to establish Mr. Tsolainos's participation in an earlier conspiracy to murder his ex-wife. Worse still, the prosecution relied

on perjured testimony by a witness who was bribed to lie at trial that Mr. Tsolainos had announced immediately after the incident that Deborah "got what she deserved." Finally, for no ascertainable purpose other than to generally impugn Mr. Tsolainos's character, the prosecution called two court-appointed psychiatrists to testify about Mr. Tsolainos's past drug use despite the fact that the information was obtained in a court-mandated evaluation that was held for the limited purpose of determining his mental competency to stand trial. For all of these reasons, the Court should grant the writ.

## II. STATEMENT OF FACTS

### A. <u>Panos and Deborah Tsolainos</u>

Panos Tsolainos is serving a life sentence without the possibility of parole after being convicted by a jury in St. Tammany Parish, Louisiana, for the second-degree murder of his ex-wife, Deborah Tsolainos. Mr. and Mrs. Tsolainos married in 1983, and shortly thereafter Mr. Tsolainos adopted the two children from Deborah's first marriage, Melissa and Clarissa, both of whom were adults at the time of the trial. Mr. and Mrs. Tsolainos also had two children together, both of whom were minors at the time of trial. While the marriage was happy for many years, it deteriorated in the early 1990s when Mrs. Tsolainos became addicted to illegal narcotics after a back injury. Trial Tr. vol. V, 1261:12-1262:10, Oct. 15, 1999 (testimony of Clarissa Tsolainos). Despite Mr. Tsolainos's attempts to convince his wife to seek treatment, Mrs. Tsolainos consistently refused. At various points during the marriage, for example, Deborah aimed a loaded gun at Mr. Tsolainos and threatened him with a knife in order to avoid treatment for her addiction. Trial Tr. vol. XI, 2103:30-2104:28, 2106:7-2107:8, Oct. 22, 1999 (testimony of Panos Tsolainos).

The couple separated in 1996 and divorced in 1997. Mr. Tsolainos was awarded custody of the minor children and the marital home in Pearl River, Louisiana. After the divorce, Deborah

Tsolainos, in order to be closer to her family, moved to St. Louis, Missouri, where she ultimately overcame her addiction to illegal narcotics. However, Deborah returned to Louisiana in 1998 to resolve ongoing disputes with Mr. Tsolainos over the custody of the minor children and distribution of community property.

### B. <u>The Alleged Conspiracy</u>

On July 7, 1998, the St. Tammany Parish Sheriff's Office arrested Mr. Tsolainos and his adopted daughter Melissa for an alleged conspiracy to murder Deborah Tsolainos. The arrest stemmed from a meeting in May 1998 between Mr. Tsolainos and a man named Gerald Branigan. Melissa had allegedly facilitated the meeting between Mr. Branigan and her father. After the initial meeting with Mr. Branigan, in which Mr. Tsolainos allegedly inquired about the possibility of having Deborah killed, Mr. Tsolainos had no further contact with Mr. Branigan. Mr. Branigan, however, solicited the help of Charles "Tinker" Schmolke—a confidential informant working with the Sheriff's Office—to assist in the supposed plot.

Mr. Tsolainos's arrest for conspiracy to murder Deborah garnered significant attention from the local media. One of the earliest news stories reported that Mr. Tsolainos had confessed to hiring a hitman to kill his wife. Bob Anderson, *St. Tammany Deputies Arrest Relatives in Murder Plot*, The Advocate, July 9, 1998, at 3B. The article also reported that deputies had arrested Mr. Tsolainos, his daughter, and a "hitman" in a conspiracy "to commit the murder of the mother of four for $5,000." *Id.* Discussing Mr. Tsolainos and his alleged co-conspirators, a sheriff spokesman declared that this was an open-and-shut case; according to the spokesman, "[a]ll three have admitted to their involvement in the plan." *Id.* Other newspapers likewise quoted the spokesman's recitation of incriminating statements Mr. Tsolainos supposedly made. According to the spokesman, Mr. Tsolainos told Branigan "to kill [his wife] with an overdose of

heroin, so it would appear accidental, or to shoot her in the head and make the motive appear to be robbery." *Id.*; Bob Ussery, *Police: Slidell Man Kills Wife; Recently Booked with Murder Plot*, The Times-Picayune, July 20, 1998, at A1. And, in another article, the spokesman intimated that Deborah could still be in danger because "we are not absolutely certain that Branigan was the only person contacted in this alleged murder-for-hire conspiracy." Richard Boyd, *Two Booked in Death Plot; Man's Estranged Wife Was Target*, The Times-Picayune, July 9, 1998, at A1.

While Mr. Tsolainos was being held on the conspiracy charge, Deborah was awarded custody of the minor children as well as temporary use of Mr. Tsolainos's home. Mr. Tsolainos's bond was set at $800,000, but Judge Patricia Hedges reduced it to $450,000. On Friday, July 17, 1998, Mr. Tsolainos was released from jail after posting the reduced bond. One of the conditions of Mr. Tsolainos's bond was that he have no contact with Deborah Tsolainos. The State ultimately dropped the conspiracy charge against Mr. Tsolainos, and a jury found Melissa not guilty of the charge.

### C. <u>Deborah Tsolainos's Death</u>

On Sunday, July 19, 1998, Deborah contacted Mr. Tsolainos and his fiancée, Connie Deville, to notify them that Ms. DeVille should retrieve her belongings that were left at the Pearl River residence. Mr. Tsolainos and Ms. DeVille arrived at the home around 12:00 p.m. in a 1993 Buick Skylark owned by Ms. Deville's mother. In addition to Deborah, Clarissa Tsolainos, her friend George Deforrest, and the two minor children were at the residence. Consistent with the terms of his bond, Mr. Tsolainos remained across the street from the home to avoid any contact with Deborah. Deborah, however, brought the two minor children out to greet Mr. Tsolainos. By all accounts the interaction between Mr. Tsolainos and Deborah was cordial

during this visit. Mr. Tsolainos and Ms. Deville left once the Buick was filled with Ms. Deville's belongings.

Mr. Tsolainos and Ms. DeVille returned to the home around 6:00 p.m. to retrieve more of Ms. Deville's belongings. Deborah again did not object to Mr. Tsolainos's presence on the property, and the contact between Mr. Tsolainos and Deborah was amicable until Mr. Tsolainos and Ms. Deville were preparing to leave. At that point, Deborah said to Mr. Tsolainos: "You used to be a good father, you can be a good father again." Trial Tr. vol. XI, 2155:30-31, Oct. 22, 1999 (testimony of Panos Tsolainos). This instigated a verbal argument between the two that escalated when Deborah Tsolainos became enraged as she banged on the Buick screaming profanities at Mr. Tsolainos.

At that point, Mr. Tsolainos and Ms. Deville attempted to leave. Mr. Tsolainos climbed into the driver's side of the 1993 Buick Skylark, an automobile with a unique gear shift/windshield wiper configuration on the same side of the steering column. Mr. Tsolainos had repeatedly confused the two levers throughout the day because he was unfamiliar with the configuration. Mr. Tsolainos put the car in reverse, causing the vehicle to lurch backward, which in turn caused Ms. Deville to fall out of the passenger's side of the vehicle. In the heat of the moment, Mr. Tsolainos, confused by the Buick's unique gearshift configuration, inadvertently turned on the windshield wipers. Slapping at the wipers to turn them off, Mr. Tsolainos instead put the car into drive, and the car accelerated forward. The car struck Deborah and proceeded across the backyard where it hit a tree, overturned on its side, and landed on top of Deborah. Deborah Tsolainos died at approximately 8:00 p.m. The St. Tammany Parish Sheriff's Office arrested Mr. Tsolainos at the scene for the murder of Deborah Tsolainos.

**D. <u>Pretrial Publicity</u>**

The media coverage intensified after Mr. Tsolainos was arrested for the murder of Deborah Tsolainos. According to the press, Mr. Tsolainos was "motivated by his fear that [his wife] would be granted custody of the couple's young children." Jarvis DeBerry, *Bond Reduction Refused by Judge; Woman Accused of Murder Plot*, The Times-Picayune, Sept. 3, 1998, at B2. Television reports quoted police as saying he "finished the job himself" and "mowed [his wife] down." Overall, the media painted a picture of a wealthy drug abuser who hired a hitman to kill his ex-wife and, upon his release on bail, intentionally hit her with his car while his three children looked on.

Following Mr. Tsolainos's arrest, the media learned that Judge Hedges had lowered Mr. Tsolainos's bond on the conspiracy charge, which had facilitated his release. The local newspapers were filled with coverage of Judge Hedges's decision to release Mr. Tsolainos on bond. *See, e.g.,* Richard Boyd & Jarvis DeBerry, *Judge's Action Skirted Rules; She Called Filing a Technicality*, The Times-Picayune, July 21, 1998, at B1. The district attorney's office quickly announced that "it did everything possible to ensure that Tsolainos would have no opportunity to act on his alleged plans to either kill his wife or have her killed by someone else." *Id.* Judge Hedges, the media reported, had bent the rules to let a murderer out of jail. *See, e.g.,* Jarvis DeBerry, *Jury May Be Probing Release of Suspect*, The Times-Picayune, July 30, 1998, at B1.

Not surprisingly, the editorial pages were highly critical of Judge Hedges. In an open letter to her, the St. Tammany bureau chief of the *Times-Picayune* scrutinized the decision to release a person "accused of hiring some goon to kill his estranged wife." Ron Thibodeaux, *Judge Has Some Explaining To Do*, The Times-Picayune, July 25, 1998, at B7. How, he asked,

could she possibly have released him when "[d]eputies said *he admitted his involvement in the crime*." *Id.* (emphasis added). The "sheriff's deputies stepped in before the job could be done," but Judge Hedges released Mr. Tsolainos anyway; and "[w]ithin 48 hours, he killed Deborah Tsolainos himself." *Id.* Noting that there has been "a lot of knee-jerk reacting around St. Tammany Parish to [Judge Hedges's] actions," the editorial described the community's outrage; those concerned were "citizens who might be trying to deal with a difficult drug abuse or domestic abuse situation in their own families. They are just plain folks who are concerned about safety in their neighborhoods and in our north shore communities." *Id.* In short, the editorial charged that because of Judge Hedges's actions, "the victim of Tsolainos' criminal actions is now dead and buried." *Id.* Another editorial levied similar condemnation. Editorial, *Hedging on the Rules*, The Times-Picayune, July 22, 1998, at B6. *The Times-Picayune* argued that "it shouldn't have been hard [for Judge Hedges] to figure out that Mrs. Tsolainos remained in danger," and the editorial concluded that "if the judge had not bent the rules for the bond company, Mr. Tsolainos would have been behind bars at least until Monday, a day after the murder." *Id.*

Shortly thereafter, the district attorney indicted Judge Hedges for lowering Mr. Tsolainos's bond. At that point, the local media coverage exploded. *The Associated Press* ran a particularly damaging story in which it quoted the special prosecutor's accusations that Judge Hedges *knew* that Mr. Tsolainos would kill his wife. *Hedges, Four Others Surrender in Bribery, Extortion Case*, The Associated Press, Oct. 10, 1998. Judge Hedges, the article reported, had *heard* Mr. Tsolainos's confession. *Id.* The story further reported that the special prosecutor "asked grand jurors to indict Hedges on negligent homicide" for "letting an alleged murder conspirator out of jail." *Id.* The special prosecutor proclaimed that "[t]his judge knew this guy

was going to murder his wife." *Id.* Judge Hedges knew this because "[a] deputy had played a tape for Hedges on which Tsolainos was heard conspiring to kill the woman." *Id.* These stories continued for months. In the public's mind, Judge Hedges's alleged judicial corruption and Mr. Tsolainos's alleged crimes were inextricably linked. In fact, Judge Hedges's case—and her decision to release Mr. Tsolainos on bail—was named one of the top ten stories of 1999 by the *St. Tammany News*. *Top Ten of 1999 Included Money, The Courts and Gambling*, St. Tammany News, Jan. 4, 2000.

The public's interest in the Tsolainos case continued to grow as the trial date approached. More than six months after his arrest, the media coverage remained intense. In April 1999, *The Times-Picayune* led with a front-page story that Mr. Tsolainos was again seeking bail. Jarvis DeBerry, *Murder Suspect Again Awaits Bail; Charge Reduced to Second-Degree*, The Times-Picayune, Apr. 27, 1999, at A1. Mr. Tsolainos, a man who had "allegedly hit three of his children in the process of running the car over his wife," might get loose again, the article reported. *Id.* The article noted the crowd that gathered at the bond hearing had "included members of the suspect's family and a representative from Safe Harbor, the Slidell battered women's shelter." *Id.* And the article quoted Mr. Tsolainos's daughter, Clarissa, who was upset with the district attorney's decision to reduce the charges against her father from first-degree murder to second-degree murder: "It ain't fair . . . He did it. He said he was gonna do it and he did it." *Id.* Another story reported that victims rights groups were "'monitoring this tragic case' and urg[ing] [the judge] either to deny Tsolainos bail or to set it no lower than $10 million." Jarvis DeBerry, *Bail Decision Is Scheduled Today; La. Judges Can Hold Dangerous Defendants*, The Times-Picayune, May 20, 1999, at B1.

In addition, normally un-newsworthy events garnered media attention. For example, the media closely followed the civil lawsuits filed by Mr. Tsolainos's children against their father. Jarvis DeBerry, *Murder Suspect's Children Sue Him*, The Times-Picayune, May 28, 1999, at A1. One article quoted Judge Green chastising Mr. Tsolainos and his attorneys for "failing to pay child support and health insurance expenses for his and the victim's two young children." Jarvis DeBerry, *Murder Suspect's Attorneys Must Pay His Child Support*, The Times-Picayune, June 23, 1999, at B4. Numerous stories covered Mr. Tsolainos's bankruptcy filing, which was allegedly done to shield assets from his young children. Jarvis DeBerry, *Child Support Colors Murder Case; Judge Considers Citing Attorneys*, The Times-Picayune, July 30, 1999, at B1. Additional stories reported that Mr. Tsolainos had a "history of cocaine abuse," Jarvis DeBerry, *Defendant Denied Request for Bail in Murder Case; Judge Says He Can Do It*, The Times-Picayune, May 21, 1999, at A1, that his alleged co-conspirator Melissa had previously been "booked with cruelty to a juvenile after deputies said she left her 1-year-old half-brother unattended for more than an hour in a Slidell fast food restaurant," Jarvis DeBerry, *Bond Reduction Refused by Judge; Woman Accused of Murder Plot*, The Times-Picayune, Sept. 3, 1998, at B2, and that his daughter Clarissa was scared that "her father would kill her if he were let out" on bail, *id.*

A month before the trial was to begin, the *Times-Picayune* reported that jurors would be allowed to hear Mr. Tsolainos's taped confession. One story, headlined "Tsolainos Not Delusional While Confessing, Detective Says; Defense Challenges Murder Suspect's Offbeat Confession," twice highlighted his alleged confession that "I killed my old lady, what can I say?" Jarvis DeBerry, The Times-Picayune, Sept. 14, 1999, at A13. The article also discussed a taped statement in which Mr. Tsolainos allegedly told Mr. Branigan, "I've had this problem with my

wife. She's trying to take my kids away." *Id.* And a week later, the *Slidell Sentry-News* ran a front page story entitled "Shattered Lives," in which the headline was featured in Halloween-like print, as if the letters were dripping blood, with a subheading that quoted Clarissa as saying, "he was calm, just as calm as could be. I begged him to help her. He looked at me calmly and said 'she's dead.'" *Shattered Lives*, Slidell Sentry-News, Sept. 20, 1999.

In light of these reports, it is no surprise that Mr. Tsolainos's case was described as "widely publicized" in the media, Stephanie Grace, *12 Freed in Jeff Booked in Killing; Crowded Jail Must Decide Who To Let Go*, The Times-Picayune, Aug. 18, 1998, at B1, and a "high-profile case," Jarvis DeBerry, *Judge Indicted in Bribe, Extortion Case: Campaign Officials Accused in Plot*, The Times-Picayune, Oct. 9, 1998, at A1. Indeed, for two consecutive years, the case was listed as one of the top ten stories in the region. The *Times-Picayune* listed the case in its "Top Ten Biggest St. Tammany Stories of 1998." *The Top Ten: The Biggest St. Tammany Stories of 1998*, The Times-Picayune, Dec. 27, 1998, at 1H2. And the *St. Tammany News* called it one of "the highest profile trials in the parish during 1999" and one of "the top 10 stories for 1999 in the Slidell area." *Top Ten of 1999 Included Money, The Courts and Gambling*, St. Tammany News, Jan. 4, 2000.

Between the date of Mr. Tsolainos's arrest for conspiracy and the date his trial commenced, there were more than 100 newspaper articles and television news reports discussing the case. The media was fascinated with every detail of this "bizarre murder-for-hire case." Editorial, *Hedging on the Rules*, The Times-Picayune, July 22, 1998, at B6. From the allegations of conspiracy and murder, to the minutiae of whether Mr. Tsolainos could make alimony payments—the media blanketed the case. And, at every step along the way, the media convinced

the public and prospective jurors that Mr. Tsolainos had conspired to murder his wife, finished the job himself after being released on bail, and then confessed to his crimes.

## E. Pretrial Proceedings

The State indicted Mr. Tsolainos for first-degree murder on August 13, 1998 in the St. Tammany Parish district court. The State later amended the indictment on April 26, 1999 to charge Mr. Tsolainos with second-degree murder in violation of La. Rev. Stat. Ann. § 14:30.1. Mr. Tsolainos pleaded not guilty and not guilty by reason of insanity.

Because of Mr. Tsolainos's insanity plea, the district court appointed two doctors, Raphael Salcedo and John Thompson, to examine Mr. Tsolainos and issue a report to the court concerning his competency to stand trial and his ability to distinguish right from wrong at the time of Deborah's death. Trial Tr. vol. X, 1821:26-31, 1846:4-12, Oct. 21, 2009 (testimony of Thompson); Trial Tr. vol. X, 1877:4-1878:6, Oct. 21, 1999 (testimony of Salcedo). Both doctors understood that, as court-appointed doctors, they were not to advocate for either party; their task was merely to report their findings to the court. *Id.* at 1821:2-25 (testimony of Thompson); *id.* at 1878:7-10 (testimony of Salcedo). Drs. Salcedo and Thompson thereafter examined Mr. Tsolainos. They told him that the interviews were not confidential, but they did not warn him or his counsel that he had the right to remain silent, that his responses could be used against him, about how his answers might be used at trial, or that the District Attorney would have access to the reports produced by the doctors for the court. *Id.* at 1826:4-20 (testimony of Thompson).

In the interviews, Mr. Tsolainos was candid and admitted—by way of background information irrelevant to both his ability to assist his counsel in the preparation of a defense and his sanity at the time of the offense—that he had in the past used cocaine and marijuana. *Id.* at 1830:17-21 (testimony of Thompson); *id.* at 1882:22-24 (testimony of Salcedo). The discussion

of those activities was necessarily brief, given its irrelevance to either issue for which the doctors were examining Mr. Tsolainos. Despite the fact that Mr. Tsolainos had entered a plea of not guilty by reason of insanity, the State never requested that Mr. Tsolainos be examined by a doctor of its choosing. In their role as court-appointed doctors, Drs. Salcedo and Thompson reported their findings to the court, and the court concluded that Mr. Tsolainos was competent to stand trial and assist in his defense.

Mr. Tsolainos, concerned that the extensive and inflammatory media pretrial publicity would make it impossible for him to receive a fair trial by an impartial jury, moved for a change of venue on September 29, 1998.[1] The district court held a hearing on the motion for change of venue on October 12, 1999. Mr. Tsolainos introduced results from a public opinion poll, which demonstrated the community's wide knowledge of the facts of the case, videotapes of news broadcasts, logs of televised reports, and copies of the numerous newspaper articles reporting the incident. At *voir dire*, the court determined that 42 out of 47 (89%) of those questioned had been exposed to pretrial publicity, and ten potential jurors were dismissed for cause for having formed an opinion about the case based on pretrial publicity. Nevertheless, the remaining jurors—all of whom had been exposed to extensive media coverage—denied that pretrial publicity would affect their ability to be impartial. The court denied Mr. Tsolainos's motion for change of venue on October 14, 1999.

---

[1] The district court initially denied Mr. Tsolainos's motion as premature on August 31, 1999, specifically reserving his right to re-urge the motion after the completion of *voir dire*. Mr. Tsolainos interlocutorily appealed this decision to the Louisiana Court of Appeal, First Circuit, and the Louisiana Supreme Court, both of which denied review. *See State v. Tsolainos*, No. 99-2885, 748 So. 2d. 457 (1999).

**F. Murder Trial**

Mr. Tsolainos's murder trial began on October 14, 1999, before Judge Fendlason, in the Twenty-Second Judicial District Court in and for the Parish of St. Tammany, Louisiana (No. 290874). The only contested element at the trial was whether Mr. Tsolainos acted with specific intent to kill Deborah Tsolainos. The State's principal evidence was Mr. Tsolainos's previous arrest for conspiracy to murder his ex-wife and an alleged statement attributed to him by George Deforrest. The defense consistently maintained that Deborah was killed accidentally. Robert C. Stern (400 Poydras Street, Suite 1710, New Orleans, Louisiana 70130) and Kimberly L. Abramson (5500 Prytania Street PMB #117, New Orleans, Louisiana 70115) represented Mr. Tsolainos at trial.

1. The State's Evidence

The State called Clarissa Tsolainos and her friend, George Deforrest, to testify. Clarissa provided a detailed account of the events leading up to her mother's death. She also testified that her mother went out with her sister on the night of Saturday, July 18, 1998, but she denied that her mother had taken a single drink of alcohol on the date of the incident—Sunday, July 19. Trial Tr. vol. V, 1277:15-21, Oct. 15, 1999 (testimony of Clarissa Tsolainos). George Deforrest, who also was at the Tsolainos home on the day of the incident, likewise testified that Deborah Tsolainos did not drink any alcohol on Sunday, July 19. *Id.* at 1224:1-11 (testimony of Deforrest). He further testified that Mr. Tsolainos said, immediately after the incident, that the "fucking bitch got what she deserved, she shouldn't have been running her fucking mouth off." *Id.* at 1215:30-31.

The State also offered the testimony of the coroner, Dr. Fraser Mackenzie, who had performed an autopsy on Deborah Tsolainos's body on July 20, 1998. In addition to testifying as to the cause of death, Dr, Mackenzie testified that he had collected blood and urine samples from

the body to determine toxicology. The results revealed Deborah's blood alcohol level to be .07, which suggested that she had consumed approximately four to five beers within an hour of her death. *Id.* at 1346:10-18, 1351:18-19 (testimony of Mackenzie). Despite this testimony, while cross-examining a defense expert, Dr. William J. George, the State suggested that Deborah's elevated blood alcohol level was caused by heat from the undercarriage of the car. Trial Tr. vol. VII, 1720:16-1721:22, Oct. 18, 1999 (testimony of George).

The State also introduced testimony concerning the events that led to Mr. Tsolainos's earlier arrest for the alleged conspiracy. Detective Scallan of the St. Tammany Parish Sheriff's Office testified that on June 30, 1998, an informant named Charles "Tinker" Schmolke contacted him. Detective Scallan testified that Mr. Schmolke "was basically scared that he was going to be under arrest by the Sheriff's Department for a hit on Panos Tsolainos's wife, and that's when I started questioning him." Trial Tr. vol. V, 1360:27-30, Oct. 15, 1999 (testimony of Scallan). Mr. Schmolke claimed that Gerald Branigan had approached him and requested his assistance in killing someone. Detective Scallan testified that Mr. Branigan told Mr. Schmolke that Mr. Tsolainos was willing to pay to have Deborah, his ex-wife, killed. To test the accuracy of this information, Detective Scallan asked Mr. Schmolke to meet with Mr. Branigan and Mr. Tsolainos while wearing an electronic transmitting and recording device. Mr. Schmolke agreed to assist with the investigation after Detective Scallan promised to "compensate" him based on the "results" of the investigation. Trial Tr. vol. VI, 1408:32-1409:16, Oct. 16, 1999 (testimony of Scallan).

Detective Scallan testified that there were three meetings during which Mr. Schmolke feigned the role of a co-conspirator. Detective Scallan attempted to record the conversations at each of the meetings, but he was only able to successfully record the first meeting between Mr.

Schmolke and Mr. Branigan. The first meeting occurred at Mr. Branigan's residence on the afternoon of June 30, 1998. During this meeting, Mr. Schmolke, wearing an electronic monitoring device, discussed the alleged conspiracy with Mr. Branigan. The audio recording of the conversation between Mr. Branigan and Mr. Schmolke was played for the jury. At the end of the tape, Mr. Schmolke gave a "synopsis" of his conversation to Detective Artigue, who had escorted him to Mr. Branigan's residence. Trial Tr. vol. V, 1365:4-5, Oct. 15, 1999 (testimony of Scallan). Detective Scallan testified that when he overheard Mr. Schmolke's conversation with Mr. Branigan, it "corroborated what Schmolke had initially told [me] was going to take place." *Id.* at 1363:11-12. Detective Scallan further testified that, after Mr. Schmolke's meeting with Mr. Branigan had concluded, Mr. Schmolke told him that "they were supposed to meet. Branigan was going to go to Tsolainos' house that night." *Id.* at 1373:31-32.

Detective Juge of the St. Tammany Parish Sheriff's Office also testified at trial. He testified that he arrested Mr. Tsolainos on July 7, 1998 for conspiracy to commit murder. Immediately thereafter, Mr. Tsolainos gave a tape-recorded statement to Detective Juge, which was played for the jury. Trial Tr. vol. VI, 1489:5-6, Oct. 16, 1999 (testimony of Juge). In the taped statement, Mr. Tsolainos admitted that he had been introduced to Mr. Branigan, whom he knew to be a hit man. Mr. Tsolainos told Mr. Branigan that he was having problems with his ex-wife because she was trying to gain custody of their children and half of their assets. Mr. Tsolainos told Mr. Branigan that the intended victim was in St. Louis, but he never provided Mr. Branigan with her address, telephone number, or any other means of locating her. Mr. Tsolainos said he was supposed to provide Mr. Branigan with a photograph of the intended victim, but he never actually did so.

Detective Juge also testified that he investigated the death of Deborah Tsolainos on July 19, 1998. He took recorded statements from the witnesses, including Clarissa Tsolainos and George Deforrest, at the residence. Mr. Tsolainos later gave a taped statement to Detective Juge at the Sheriff's Office after his arrest. *Id.* at 1502:16-17. In the taped statement, which was played for the jury, Mr. Tsolainos denied intentionally hitting Deborah Tsolainos with the vehicle. He said that he was trying to leave the premises and that he thought the vehicle was in reverse when he pressed the accelerator, but that he must have mistakenly shifted the vehicle into drive while attempting to turn off the windshield wipers.

2. <u>The Defense's Evidence</u>

Mr. Tsolainos testified in his own defense. While he admitted hitting Deborah with the vehicle, he testified it was an accident because he inadvertently shifted the vehicle into drive while attempting to turn off the windshield wipers. Trial Tr. vol. XI, 2163:21-2165:7, Oct. 22, 1999 (testimony of Panos Tsolainos). Mr. Tsolainos also presented a number of witnesses who testified in support of the accidental nature of Deborah Tsolainos's death. Betty Rodriguez, the owner of the Buick Skylark and Ms. Deville's mother, testified that she also, on several occasions, had problems differentiating between the gearshift and the windshield wiper lever. Trial Tr. vol. X, 2022:17-24, Oct. 21, 1999 (testimony of Rodriguez). Ms. DeVille also testified. She explained to the jury that each time Mr. Tsolainos attempted to shift the vehicle on July 19th, the windshield wipers would engage. Trial Tr. vol. XI, 2038:27-29, Oct. 22, 1999 (testimony of DeVille).

Dr. Edward Carnes, an expert human factors ergonomist and human factors engineer, testified for the defense on the subject of design defects with the 1993 Buick Skylark that Mr. Tsolainos was driving on the day of the incident. He testified that this vehicle contained several design defects—notably the gearshift lever and windshield wiper lever of similar size and shape

located in close proximity to one another on the same side of the steering column—giving rise to increased potential for "control misapplication" or "operator error." Trial Tr. vol. VII, 1670:15-24, Oct. 18, 1999 (testimony of Carnes). Dr. Carnes also testified that the direction of movement to activate and de-activate the two controls was the same, as was the diameter of the two levers, which caused them to feel the same. *Id.* at 1675:12-1676:7.

Dr. Carnes further testified that this design configuration was unique, even among automobiles at the time, as most automobiles with gearshift levers on the steering column placed that lever on the right side, but placed the windshield wiper lever on the left side to prevent confusion. *Id.* at 1677:4-21. Dr. Carnes related that people are inclined to believe that if they are using a certain control, it will behave in a certain way, and that when the behavior does not match expectations it causes a state of hypervigilence. *Id.* at 1679:1-22. He testified that an unintended acceleration caused by hypervigilence would be a "usual" response to control misapplication of a gearshift, and that such episodes last on average 8-12 seconds and often lead to crashes. *Id.* at 1680:18-25. He testified that there was a reasonable probability of control misapplication causing an unintended shift in the gears, that such an unexpected shift would cause hypervigilence, and that it would not be at all unusual for a vehicle to travel 50-60 feet in such a circumstance. *Id.* at 1682:4-27.

Dr. John Wilson also testified for the defense, offering a psychological opinion that Mr. Tsolainos suffered from "post-traumatic stress disorder, chronic," "generalized anxiety disorder," and "dysphemia disorder." The general theme of his testimony was that various stressors in Mr. Tsolainos's life affected his mental state. Trial Tr. vol. X, 1944-1964, Oct. 21, 1999 (testimony of Wilson). Dr. Wilson confirmed that he did not contend that Mr. Tsolainos was legally insane

at the time of the incident, *id.* at 1936:19-21, or that the mental issues he identified in Mr. Tsolainos *per se* accounted for his actions on July 19, 1998, *id.* at 1936:22-25.

3. The State's Rebuttal Evidence

Although neither Dr. Carnes nor Dr. Wilson ever testified as to Mr. Tsolainos's drug use—or even suggested that past drug use might have some relevance to the opinions they offered—the State nevertheless expressed its desire to call Drs. Thompson and Salcedo as rebuttal witnesses to counter these opinions by introducing evidence of Mr. Tsolainos's past drug use.[2] The court held a hearing on the issue during which Dr. Wilson testified categorically that past drug use by Mr. Tsolainos had no relevance whatsoever to his diagnoses because there was no evidence that Mr. Tsolainos's mental state was affected by either the use of drugs or withdrawal from drugs on the date of the incident. Trial Tr. vol. VIII, 1735:7-1739:11, Oct. 19, 1999 (testimony of Wilson). He stated that, "hypothetically," withdrawal from cocaine could contribute to a rageful state, but that there was no evidence that Mr. Tsolainos was suffering from withdrawal, and that his opinion was that withdrawal did not actually contribute to Mr. Tsolainos's mental state. *Id.* at 1739:12-20.

Notwithstanding this testimony, the court ruled that because Mr. Tsolainos planned to put at issue his mental state on the date of the incident, and because Dr. Wilson testified that, hypothetically, cocaine usage or withdrawal could affect a person's state of mind, testimony regarding Mr. Tsolainos's past drug use would be admissible. *Id.* at 1740:16-1741:28. Counsel for Mr. Tsolainos objected on the record, stating that there was no testimony whatsoever that Mr.

[2] On re-direct by defense counsel, in response to questions raised on cross-examination, Dr. Wilson was asked hypothetical questions about whether drug use could lead a person to say things that they do not mean, with particular reference to Mr. Tsolainos's participation in an alleged conspiracy to kill Mrs. Tsolainos. Trial Tr. vol. X, 1983:27-1984:30, Oct. 21, 1999 (testimony of Wilson).

Tsolainos's mental state was actually impacted by drug use or withdrawal, that, in fact, the State's theory of the case was to the contrary, and that the purpose of the testimony was thus to put the "bad act" of drug use in front of the jury for an illegitimate reason. *Id.* at 1741:29-1744:8. Defense counsel also objected to the State's use of Drs. Thompson and Salcedo to present testimony "on issues other than those raised by the Court and their specific mandate to determine whether Mr. Tsolainos met the *Bennett* criteria for being able to assist his counsel or whether he was legally sane at the time of the offense." *Id.* at 1750:3-14. Counsel also made clear that Mr. Tsolainos was not presenting a defense of legal insanity, but rather was presenting testimony "explaining the psychological basis for stress." *Id.* at 1750:14-20.

The State made a proffer of testimony from Drs. Thompson and Salcedo. *Id.* at 1757. Counsel for Mr. Tsolainos again objected, specifically raising the fact that these doctors were court-appointed experts who examined Mr. Tsolainos only on competency to stand trial and sanity at the time of the incident; counsel made clear that he objected to the use of testimony concerning Mr. Tsolainos's "involuntary and uncounseled disclosures to a pre-trial sanity commission" as to any "areas which were not a portion of [their] charge pursuant to a sanity commission." *Id.* at 1758:1-7. Dr. Salcedo testified that his client is the court, not the parties, that he advised Mr. Tsolainos of the limited nature of his examination, and that Mr. Tsolainos made disclosures "based upon" those representations. *Id.* at 1769:3-1770:12. Dr. Salcedo testified that he did not find any effect of drug use or withdrawal on Mr. Tsolainos's mental state at the time of the offense, *id.* at 1771-72, but that it could hypothetically influence someone's mental state, *id.* at 1773:23-1774:2.

Dr. Thompson testified that counsel for Mr. Tsolainos was present with Mr. Tsolainos prior to the examinations. *Id.* at 1779:21-26. He stated that he told Mr. Tsolainos that the

interview was non-confidential and informed him of the limited purpose of the examination. *Id.* at 1779:27-1780:21. Dr. Thompson testified that he told Mr. Tsolainos that he was there pursuant to a court appointment, and conceded that he never told Mr. Tsolainos that he might later testify on issues unrelated to competency to stand trial or sanity at the time of the incident. *Id.* at 1782:1-22. He also never told Mr. Tsolainos that he might eventually testify on behalf of the State. *Id.* at 1782:23-1783:16. Dr. Thompson stated that he did not make a diagnosis of substance abuse because Mr. Tsolainos was not using drugs at the time and it "had been a significant period of time" since he had last used them. *Id.* at 1787:1-13. He further testified that drug use and withdrawal would have had no effect on Mr. Tsolainos's mental state on the day of the incident. *Id.* at 1788:20-1790:1. He reiterated on cross-examination that although withdrawal could hypothetically affect a person's mental state, he was not of the opinion that it affected Mr. Tsolainos on the day of the incident. *Id.* at 1790:19-28.

The court again took the issue under advisement, *see id.* at 1792-1795, and ruled that Drs. Salcedo and Thompson could both testify before the jury on the issue of drug use because it was relevant to Mr. Tsolainos's mental state, which was raised by the testimony of Drs. Wilson and Carnes. *Id.* at 1795:16-1796:4. The court found that the testimony was admissible under Louisiana evidence law and that the admission of testimony from court-appointed doctors would not violate "any patient/physician privilege." *Id.* at 1796:5-25. Defense counsel offered to stipulate that Mr. Tsolainos was not raising a plea of not guilty by reason of insanity and that he would not call Dr. Wilson as a witness, but the court nevertheless found that Drs. Salcedo and Thompson could testify even in the event that Mr. Tsolainos made such a stipulation. *Id.* at 1797:20-1798:17.

When the jury returned, Dr. Thompson testified that he understood that no doctor, nor Mr. Tsolainos, was contending that Mr. Tsolainos was legally insane at the time of the incident. Trial Tr. vol. X, 1823:15-30, Oct. 21, 1999. When asked whether he was satisfied that "there was no indication that Mr. Tsolainos had any mental disease or defect of any type, that bore on his state of mind" at the time of the incident, Dr. Thompson testified that Mr. Tsolainos "had a history of some alcohol abuse and he had a history of some cocaine abuse." *Id.* at 1829:21-29. But Dr. Thompson added that he "gave him diagnosis of marijuana and cocaine abuse by history. So that was an Axis I diagnosis that needed to be noted, but it wasn't impacting on his sanity, or lack thereof, on the day of the offense." *Id.* at 1830:4-7. Dr. Thompson's overall opinion was that drug abuse had no effect on Mr. Tsolainos's mental state. *See id.* at 1833:2-3; *id.* at 1848:25-1849:13. This is not surprising given that there was no indication that Mr. Tsolainos was using drugs at the time of the incident, that Mr. Tsolainos never reported experiencing hallucinations or psychotic thought processes at that time, and that there was no indication that Mr. Tsolainos was in withdrawal or that drug use impacted his mental state in any way. *See id.* at 1831:1-31; *id.* at 1833:24-1834:9. Even though it was established that Dr. Thompson believed that Mr. Tsolainos's past drug use had no effect whatsoever on his mental state on the day of the incident, the State repeatedly asked Dr. Thompson about Mr. Tsolainos's past drug use and what effect cocaine ingestion would have had on his mental state had he been using it on the day of the offense. *Id.* at 1860:10-1862:16. This line of questioning was clearly irrelevant—under Dr. Thompson's own view—to any issue to be decided by the jury and was introduced only to prejudice the jury against Mr. Tsolainos.

Dr. Salcedo took the stand next; he agreed that Mr. Tsolainos's history of drug use was immaterial to either his competency to stand trial or his mental state at the time of the incident:

"A. . . . That clearly was not an issue by the time that I examined him, in that he did not appear to be intoxicated with either crack or marijuana, nor did he appear to be suffering withdrawals from either one of those substances. Q. But it was an issue with respect to his mental state on July 19th, 1998, wasn't it? A. Not to my knowledge." *Id.* at 1880:1-8. Dr. Salcedo testified that he had no information that would call into question Dr. Thompson's report that "[a]ny effects that these drugs may have had on his mental state would no longer be present" on the day of the incident. *Id.* at 1879:20-29. He said he "considered" whether drugs or alcohol could have played a role in the incident and that he concluded that Mr. Tsolainos's past use of drugs was "not relevant" to his mental state "either with respect to drug intoxication or drug withdrawal." *Id.* at 1880:11-24. Nevertheless, the State persisted in asking questions about Mr. Tsolainos's drug use in an attempt to call into question the truthfulness of Mr. Tsolainos's disclosure that he had not used drugs on the day of the incident but had done so only in the past. *See id.* at 1882:22-1883:6.

On October 23, 1999, the jury convicted Mr. Tsolainos of second-degree murder by a 10-2 vote, the minimum number of votes needed to convict under Louisiana law. On April 26, 2000, he was sentenced to life in prison at hard labor without possibility of parole.

### G. <u>Perjury</u>

Several witnesses came forward after the trial to testify that Clarissa Tsolainos had committed perjury and bribed Mr. Deforrest to provide false testimony against Mr. Tsolainos. In particular, two witnesses testified that Clarissa had admitted offering Mr. Deforrest money to lie for her at the trial. First New Trial Hr'g Tr., 13:6-8, 20:6-20, Nov. 26, 2001 (testimony of Breaux and Showalter). Another witness testified that Clarissa admitted to him that Mr. Deforrest had never overheard Mr. Tsolainos say the "bitch got what she deserved" on the day of

the incident. Transcript of Tape-Recorded Statement of Patrick Pigrenet to Ron Frazier at 2-3, Nov. 14, 2001. Mr. Tsolainos filed a motion for new trial based upon this newly discovered evidence of perjury. Clarissa and Mr. Deforrest appeared before the trial court to unequivocally deny the allegations. The trial court denied the motion on November 26, 2001.

Clarissa Tsolainos later came forward to admit that she had lied at her father's murder trial and at the November 2001 hearing. She admitted, in February 2003, that she and Mr. Deforrest had both lied about her mother's alcohol consumption on the day of the incident. She also admitted that she had offered to pay Mr. Deforrest for his testimony at trial and that the witnesses at the November 2001 hearing had testified truthfully. Second New Trial Hr'g Tr., 17:29-19:8, 19:9-20:31, Feb. 25, 2003 (testimony of Clarissa Tsolainos). The trial court again denied Mr. Tsolainos's motion for a new trial after hearings held on February 25-26, 2003.

**H. <u>Direct Appeal</u>**

Mr. Tsolainos timely appealed his conviction to the Court of Appeal of Louisiana, First Circuit. Among other assignments of error, Mr. Tsolainos argued that the trial court erred in refusing to grant a new trial based on perjured testimony; erred in denying the motion for a change of venue because he did not receive a fair and impartial trial; erred in denying him the right to confront the witnesses against him; and erred in admitting evidence of his past drug use. The First Circuit affirmed Mr. Tsolainos's conviction on December 31, 2003. *State v. Tsolainos*, No. 2000 KA 1664, 864 So. 2d 905 (La. Ct. App. 2003). Mr. Tsolainos timely filed an Application for Supervisory Writ of Review in the Louisiana Supreme Court, which declined to accept the appeal on July 2, 2004. *State v. Tsolainos*, No. 2004-K-0616, 877 So. 2d 144 (La. 2004). Mr. Tsolainos thereafter timely petitioned the Supreme Court of the United States for a writ of certiorari on September 29, 2004. The Supreme Court denied the petition on February

28, 2005. *Tsolainos v. Louisiana*, No. 04-450, 543 U.S. 1186 (2005). Mr. Stern, Ms. Abramson, and Lewis Unglesby (246 Napoleon Street, Baton Rouge, Louisiana 70802) represented Mr. Tsolainos throughout the direct appeal. Declaration of Panos Tsolainos ("Tsolainos Declaration") ¶ 3.

**I. <u>State Post-Conviction Proceedings</u>**

Unable to overturn the conviction on direct appeal, Mr. Tsolainos and his counsel developed a plan to petition both the Louisiana courts and the federal courts for post-conviction relief. It was at this juncture that Ms. Abramson expressed a desire to proceed without Mr. Stern and to replace him with her husband, Neil Abramson, and Harry Rosenberg, both of whom are partners at Phelps Dunbar LLP (365 Canal Street, Suite 2000, New Orleans, Louisiana 70130). *Id.* ¶ 4. Based on Ms. Abramson's insistence and his own knowledge of Mr. Rosenberg's strong reputation as the former United States Attorney for the Eastern District of Louisiana, Mr. Tsolainos terminated his relationship with Mr. Stern. *Id.*

Mr. Tsolainos's new team of attorneys advised him that his best chance at having his conviction overturned would be in federal court. They advised Mr. Tsolainos, however, that he was required to first pursue relief in the state courts in order to preserve his federal claims and that he could not bring a federal petition until the state process had concluded. *Id.* ¶ 5. Mr. Tsolainos relied on their advice and judgment in how to proceed and allowed them to make strategic decisions. However, he repeatedly told them that there was no reason to delay filing a petition for post-conviction relief in state court simply because state law provided them two years to file it. *Id.* ¶ 6. The relief from limitations periods that Governor Blanco, the Louisiana Supreme Court, and the legislature provided in the wake of Hurricane Katrina served to provide

even more time within which to file the state post-conviction petition, but Mr. Tsolainos again admonished his attorneys to file it as soon as it was ready. *Id.* ¶ 7.

Mr. Tsolainos was repeatedly given assurances that his attorneys were doing all they could to get the petition filed. In the end, Mr. Tsolainos's application for post-conviction relief was filed in the Twenty-Second Judicial District Court for the Parish of St. Tammany on July 5, 2006, more than sixteen months after the United States Supreme Court denied Mr. Tsolainos's petition for certiorari. *Id.* Among other claims for relief, Mr. Tsolainos argued that he was denied his Sixth Amendment right to confront witnesses against him; that the admission of his prior drug use and testimony from the sanity commission violated his Fifth and Sixth Amendment rights; that he was denied his constitutional right to a fair and impartial jury; and that his right to Due Process was violated by the use of perjured testimony at trial.

The St. Tammany Parish district court declined to grant any post-conviction relief after holding an evidentiary hearing. The Louisiana Court of Appeal affirmed that decision in a ruling dated October 10, 2008. *State v. Tsolainos*, No. 2007 KW 2443, 997 So. 2d 46 (La. Ct. App. 2008). Although Mr. Tsolainos had presented approximately thirteen assignments of error in his post-conviction petition, the Court of Appeal addressed the merits of only three arguments, including the Confrontation Clause claim, finding that the others had already been addressed on direct appeal. *Id.* at 47 n.1. The Louisiana Supreme Court denied Mr. Tsolainos's Application for a Supervisory Writ of Review on October 9, 2009. *State v. Tsolainos*, No. 2008-KP-2653, 19 So. 3d 6 (La. 2009).

Unfortunately, Mr. Tsolainos's relationship with his counsel became strained during the state post-conviction proceedings. Ms. Abramson, Mr. Tsolainos's chief contact and longest-serving lawyer, became unresponsive and rude. Mr. Tsolainos had a very difficult time

obtaining any information on the status of his case from any of his lawyers, and it would sometimes be weeks in between contacts despite Mr. Tsolainos's persistent efforts to speak with either Ms. or Mr. Abramson. Tsolainos Declaration ¶ 8. Although this made Mr. Tsolainos uneasy, he felt he needed Ms. Abramson to remain on the case because of her extensive knowledge of the record. *Id.* ¶ 9.

In February 2009, Ms. Abramson contacted Mr. Tsolainos to obtain a $100,000 retainer for the preparation of the federal habeas corpus petition. *Id.* ¶ 10; Declaration of John Vagelos ("Vagelos Declaration") ¶ 9. Mr. Tsolainos approved Ms. Abramson's request, paid her the retainer, and then sought reimbursement from the family trust (the "Trust") that was funding his attempt to obtain post-conviction relief. Vagelos Declaration ¶¶ 2, 9. The Trust ultimately reimbursed Mr. Tsolainos, *id.* ¶ 9, and, on February 27, 2009, the Trust separately paid Phelps Dunbar a $150,000 retainer also for the purpose of preparing a federal habeas corpus petition, *id.* ¶ 8. Mr. Tsolainos's legal team, based on their assertion that the federal petition was due one year after the state post-conviction proceedings had concluded, informed Mr. Tsolainos that his petition was due on October 9, 2010. *Id.* ¶ 10. Mr. Tsolainos thus was under the impression that Ms. Abramson and his other attorneys were diligently preparing the federal habeas corpus petition in accordance with the agreed-upon schedule. He had no reason to question their representations as they repeatedly told him they were working on it, and indicated that they would file it by Thanksgiving and, later, by Christmas. Tsolainos Declaration ¶¶ 11-12. He also believed that these attorneys were preparing it because the Trust was paying out large sums of money, ostensibly for the preparation of a federal habeas corpus petition. *Id.* In the meantime, Mr. Tsolainos kept requesting that Ms. Abramson to give him an idea as to when the petition

would be filed, but the communication problems that began a few years earlier persisted, and he was unable to confirm his attorneys' progress. *Id.*

Mr. Tsolainos's trust in the Abramsons continued to deteriorate; after a dispute arose in early 2010 over a personal matter unrelated to his conviction, Mr. Tsolainos made the decision to terminate the representation. *Id.* ¶ 13. However, Mr. Tsolainos wanted to continue to be represented by Mr. Rosenberg, and on January 25, 2010 he wrote a letter to this effect to Phelps Dunbar. *Id.* ¶ 14. On January 29, 2010, Mr. Abramson informed Mr. Tsolainos by letter that Phelps Dunbar would only continue representing him if he and Ms. Abramson were permitted to remain on the case. *Id.* And, on February 24, 2010, Mr. Abramson wrote Mr. Tsolainos a follow-up letter inquiring whether he would allow the "current legal team of Phelps Dunbar LLP, including partners Harry Rosenberg and Neil Abramson, and outside counsel, Kim Abramson to continue to represent [him] as previously outlined in our agreements." *Id.* ¶ 15. The letter also advised Mr. Tsolainos that the "Louisiana Supreme Court denied your writs for relief relating to your post-conviction relief on October 9, 2009. Also please be advised that federal law includes a one-year period relating to habeas corpus relief." *Id.* Finally, the letter included a hand-written notation that Nick Bookis (Mr. Tsolainos's friend) would consider it "a personal favor" to "keep the team intact." *Id.* Having been refused his request to remove the Abramsons from his legal team, Mr. Tsolainos chose to terminate his relationship with Phelps Dunbar altogether. *Id.* ¶ 16. Shortly thereafter, Mr. Stern agreed to once again represent Mr. Tsolainos and to assist with the filing of the federal habeas petition. *Id.* ¶ 17.

During this same period, the trustees became concerned with the bills that Ms. Abramson was submitting to the Trust for payment with regard to Mr. Tsolainos's post-conviction legal defense. *Id.* ¶ 11; Vagelos Declaration ¶¶ 5-7 Over time, Ms. Abramson's bills had become

more cryptic and provided few details as to the basis for the charges. Vagelos Declaration ¶ 5. As a result, the Trust advised Ms. Abramson to promptly provide adequate descriptions of her time and to explain the nature of the work she was performing on Mr. Tsolainos's behalf. *Id.* ¶ 6. Ms. Abramson, through counsel, responded that the charges were compensation for the preparation of Mr. Tsolainos's federal habeas corpus petition but refused to provide the Trust with any time entries on the theory that it would compromise attorney-client privilege. Tsolainos Declaration ¶ 19; Vagelos Declaration ¶ 7. Ms. Abramson was informed that she could no longer submit her bills for payment from the Trust without specific time entries. Vagelos Declaration ¶ 9. Even after Mr. Tsolainos terminated his relationship with Ms. Abramson and Phelps Dunbar, Ms. Abramson continued to take the position that the Trust was adverse to Mr. Tsolainos and that she had an ethical duty to Mr. Tsolainos to refuse to provide specific time entries to the Trust. Tsolainos Declaration ¶ 19; Vagelos Declaration ¶ 7. Despite repeated attempts to resolve the billing issue, Ms. Abramson has never provided any time entries for the work she allegedly performed in preparing Mr. Tsolainos's federal habeas corpus petition. Vagelos Declaration ¶ 11.

In the meantime, lawyers for the Trust investigated how Ms. Abramson could be preparing a federal habeas corpus petition so long after Mr. Tsolainos's conviction. Tsolainos Declaration ¶ 16; Vagelos Declaration ¶ 10. Those attorneys concluded that the time for filing a federal habeas corpus petition had passed. Tsolainos Declaration ¶ 16; Vagelos Declaration ¶ 10. Moreover, despite repeated assurances to the contrary, it appears that no federal habeas petition was ever prepared by either Ms. Abramson or Phelps Dunbar. Tsolainos Declaration ¶ 17. On July 27, 2010, Phelps Dunbar returned $97,695.62 to the Trust from the $150,000 retainer it received in February 2009. Vagelos Declaration ¶ 12. To date, Ms. Abramson has not

returned any of the $100,000 retainer she was paid for the preparation of Mr. Tsolainos's federal habeas petition. *Id.* ¶ 11.

## III. THE COURT SHOULD EQUITABLY TOLL AEDPA'S ONE-YEAR STATUTE OF LIMITATIONS AND CONSIDER THE PETITION TO BE TIMELY.

AEDPA provides that a "1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). Mr. Tsolainos's conviction became final when the Supreme Court of the United States denied his petition for a writ of certiorari on February 28, 2005. *Jimenez v. Quarterman*, 129 S. Ct. 681, 687 (2009). AEDPA's one-year clock therefore began to run on March 1, 2005. 28 U.S.C. § 2244(d)(1)(A); *Holland v. Florida*, 130 S. Ct. 2549, 2555 (2010). Under normal circumstances, then, the one-year limitations period would have expired on February 28, 2006. However, the Eastern District of Louisiana tolled all federal limitations periods, including any applicable AEDPA deadlines, for 86 days between September 1, 2005 and November 25, 2005 in response to Hurricane Katrina. *See Mark v. Michael*, No. 08-1261, 2008 WL 4365929, at *2 (E.D. La. Sept. 23, 2008); *Hampton v. Wilkinson*, No. 08-1535, 2008 WL 4829716, at *2 (E.D. La. Aug. 26, 2008). Taking that period into account, Mr. Tsolainos's AEDPA deadline was set to expire on or about May 25, 2006, one year and 86 days after the Supreme Court of the United States denied his petition for a writ of certiorari.

AEDPA also provides, however, that the "time during which a properly filed application for State post-conviction . . . review [is] pending shall not be counted" against that one-year period. 28 U.S.C. § 2244(d)(2). Thus, if a petitioner files a petition for post-conviction relief in state court before the expiration of the AEDPA one-year limitations period, the federal clock stops running until the state post-conviction action is concluded. But the one-year clock does not reset; rather, it resumes from where it left off. *See Scott v. Johnson*, 227 F.3d 260, 263 (5th Cir.

2000); *Magee v. Cain*, No. 99-3867, 2000 WL 1023423, at *4 (E.D. La. July 24, 2000), *aff'd*, 253 F.3d 702 (5th Cir. 2001); *Williams v. Cain*, No. 00-536, 2000 WL 863132, at *2 (E.D. La. June 27, 2000). Louisiana law, in contrast, provides an incarcerated person two years within which to file a petition for post-conviction relief. *See* La. Code Crim. Proc. Ann. Art. 930.8(A). Thus, although Mr. Tsolainos timely filed his state petition for post-conviction relief (*i.e*., within the allotted two-year period) on July 5, 2006, by then the AEDPA limitations period had already expired approximately forty-two days earlier. Mr. Tsolainos's state petition for post-conviction relief therefore did not trigger the suspension mechanism of Section 2244(d)(2), and his opportunity to file a timely federal habeas corpus petition was thereby lost.

Last Term, however, the Supreme Court held that because AEDPA's one-year limitations period is not jurisdictional, it is subject to equitable tolling. *Holland*, 130 S. Ct. at 2554-60; *see also Davis v. Johnson*, 158 F.3d 806, 807 (5th Cir. 1998). Under *Holland*, AEDPA's limitations period should be equitably tolled so long as the petitioner can show that (1) some extraordinary circumstance stood in the way of filing the petition within the statutory period and (2) that he has been pursuing his rights with "reasonable" diligence. 130 S. Ct. at 2564-65; *see also Lawrence v. Florida*, 127 S. Ct. 1079, 1085 (2007); *Mathis v. Thaler*, No. 08-70021, 2010 WL 3278609, at *9 (5th Cir. Aug. 20, 2010) (applying *Holland*). As the Fifth Circuit has explained, finding a habeas petition time-barred is inappropriate under this standard where "strict application of the statute of limitations would be inequitable." *Davis*, 158 F.3d at 810. And, in evaluating the equities, the district court "must consider the individual facts and circumstances of each case in determining whether equitable tolling is appropriate." *Mathis*, 2010 WL 3278609, at *9. For the reasons set forth below, the facts and circumstances of this particular case warrant this Court

exercising its considerable discretion to equitably toll AEDPA's limitations period and to consider this petition to be timely filed.

**A. <u>The Facts Underlying Mr. Tsolainos's Former Counsel's Failure to Timely File His Federal Habeas Corpus Petition Constitute an Extraordinary Circumstance Warranting Equitable Tolling.</u>**

In *Holland*, the Supreme Court held that "unprofessional attorney conduct" can qualify as an extraordinary circumstance warranting equitable tolling. 130 S. Ct. at 2563-64. In so ruling, the Court explicitly disagreed with the Eleventh Circuit's determination that "grossly negligent" attorney conduct could never rise to the level of an "extraordinary circumstance" sufficient to warrant equitable tolling. At the same time, the Court reiterated that "'a garden variety claim of excusable neglect' such as a simple 'miscalculation' that leads a lawyer to miss a filing deadline does not warrant equitable tolling." *Id.* at 2564 (quoting *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990)) (other citations omitted). Thus, although an attorney's failure to timely file a petition and properly calculate the limitations period "might suggest simple negligence," *id.* at 2564, additional facts, such as a lack of communication between attorney and client and a failure on the part of an attorney to "do the research necessary to find out the proper filing date," could signal the kind of gross error that is sufficient to constitute an "extraordinary circumstance" warranting equitable tolling, *id.* Accordingly, the Supreme Court flatly rejected the Eleventh Circuit's position that an exceptional circumstance could only exist based on attorney misconduct where the attorney had acted in bad faith, dishonestly, with divided loyalty, or had a mental impairment. *Id.* at 2554.

*Holland* thus represents a sea-change in the law with regard to finding "extraordinary circumstances" based on attorney misconduct. Before *Holland*, the Fifth Circuit, like the Eleventh Circuit, rarely permitted equitable tolling based on attorney misconduct. Indeed, pre-*Holland*, the Fifth Circuit had held that an attorney's intentional misrepresentations to the client

represented essentially the only ground that could warrant equitable tolling. *United States v. Wynn*, 292 F.3d 226, 230-31 (5th Cir. 2002) (equitably tolling the limitations period because prisoner's attorneys deceived the prisoner into believing that habeas petition had been timely filed); *see also Vineyard v. Dretke*, 125 F. App'x 551, 553 (5th Cir. 2005); *Towles v. Dretke*, No. 403CV822Y, 2003 WL 22952820, at *3 (N.D. Tex. Dec. 10, 2003). As a consequence, the Fifth Circuit adopted the now-discredited position that "counsel's erroneous interpretation of the statute of limitations provision cannot, by itself, excuse the failure to file [a] habeas petition in the district court within the one-year limitations period." *Fierro v. Cockrell*, 294 F.3d 674, 683 (5th Cir. 2002).

That is no longer the law after *Holland*. The Supreme Court has instead drawn a line between "mere negligence," such as simple mathematical errors of calculation, and "gross negligence," such as failing to perform basic research that would have disclosed the federal habeas filing deadlines and failing to adequately communicate with the petitioner. *See Holland*, 130 S. Ct. at 2564. Under *Holland*, mere negligence does not qualify as an extraordinary circumstance. But contrary to the Fifth Circuit decisions pre-dating it, *Holland* makes clear that gross negligence falls within the heartland of the extraordinary circumstances warranting the invocation of equitable tolling. The present case is the quintessential example of this type of grossly negligent attorney conduct.

Indeed, there can be no question that grossly negligent attorney conduct was the primary factor in Mr. Tsolainos's failure to timely file a federal habeas corpus petition. This is not a case of simple mathematical error. Rather, Mr. Tsolainos's lawyers fundamentally misunderstood the relationship between federal and state post-conviction proceedings. Mr. Tsolainos's attorneys clearly understood that, in light of AEDPA's exhaustion requirement, only those claims for relief

that have been raised in a state post-conviction petition can be included in a federal habeas petition. 28 U.S.C. § 2254(b)(1)(A), (c). Indeed, it was on that precise basis that Mr. Tsolainos's attorneys correctly informed him that a federal habeas petition could not be filed until any state post-conviction proceeding had concluded. But they did not understand that the practical result of the interaction between AEDPA's "exhaustion" requirement and the operation of its limitations period is that the state post-conviction petition *must* be filed within one year of the conclusion of direct review for the petitioner to be able to preserve the ability to pursue federal habeas relief. Thus, despite the fact that Louisiana law provides two years within which to file a state post-conviction petition, in light of the operation of AEDPA's one-year limitations period, the second year that Louisiana provides is useful only to those who have no need or desire to file a federal habeas corpus petition.

The failure of Mr. Tsolainos's attorneys to understand the basic operation of AEDPA was not mere negligence. Not only are the steps necessary to ensuring that the federal habeas petition will be timely clearly spelled out in the statute itself, but the answer was readily available in a prominent federal habeas corpus manual,[3] several well-regarded treatises,[4] and literally hundreds

---

3 *See* Brian R. Means, Federal Habeas Manual § 9A:5 (2010) ("The existence of a longer state limitations period does not extend the federal one-year limitations period.").

4 *See, e.g.*, 16A Federal Procedure, Lawyers Edition § 41:350 (2010) ("The time during which a properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending is not counted toward any period of limitation for filing an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court. While this tolling provision excludes the time during which a properly filed state relief application is pending, it does not reset the date from which the one-year statute of limitations begins to run."); 7 Criminal Procedure § 28.5(b) (3d ed. 2009) ("Section 2244(d) now provides a one-year period for filing a habeas petition. The limitation period begins to run on the date on which the judgment challenged became final by the 'conclusion of direct review or the expiration of the time for seeking such review.' . . . The limitation period is tolled for any period during which a properly filed collateral attack was pending before the state courts.").

of federal judicial decisions.[5] Thus, this was not merely a failure to apprehend the statutory scheme; misunderstanding this fundamental issue was necessarily the result of a failure to conduct basic research on this important question. Indeed, the fact that these lawyers continue to

---

5 *See Wion v. Quarterman*, 567 F.3d 146, 148 n.1 (5th Cir. 2009) ("[S]tate habeas petition filed after AEDPA limitations period does not toll limitations.") (citing *Scott v. Johnson*, 227 F.3d 260, 263 (5th Cir. 2000)); *Williams v. Cain*, 217 F.3d 303, 304 (5th Cir. 2000) (explaining that the filing of state post-conviction petition *suspends* AEDPA limitations period); *Williams v. Warden, David Wade Corr. Center*, No. 09-0817, 2009 WL 2849571, at *2 (W.D. La. Sept. 3, 2009) ("Petitioner cannot rely on the statutory tolling provision of § 2244(d)(2) because . . . he did not file his first collateral attack in the state courts until January 18, 2008 . . . and by that time, although the 2-year State limitations had not expired, the 1-year AEDPA limitations period had already long expired."); *see also Cordle v. Guarino*, 428 F.3d 46, 48 n.4 (1st Cir. 2005) ("Section 2244(d)(2) only stops, but does not reset, the AEDPA clock from ticking and cannot revive a time period that has already expired." (citation and alteration omitted)); *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) ("[P]roper calculation of Section 2244(d)(2)'s tolling provision excludes time during which properly filed state relief applications are pending but does not reset the date from which the one-year statute of limitations begins to run."); *Johnson v. Hendricks*, 314 F.3d 159, 161-62 (3d Cir. 2002) ("[Section] 2244(d)(2)'s tolling provision excludes time during which a properly filed state post-conviction is pending but does not reset the date from which the one-year limitations period begins to run."); *Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir. 2003) ("[S]ection 2244(d) does not permit the reinitiation of the limitations period that has ended before the state petition was filed."); *Fisher v. Gibson*, 262 F.3d 1135, 1142-43 (10th Cir. 2001) (explaining that petitioner's federal petition "cannot be tolled for time spent in state post-conviction proceedings because his applications for [state] post-conviction relief were not filed until after . . . the end of the [federal] limitations period"); *Tinker v. Moore*, 255 F.3d 1331, 1335 n.4 (11th Cir. 2001) ("[A] properly and timely filed petition in state court only tolls the time remaining in the federal limitation period. Thus, care must be taken to assure that sufficient time remains within the federal statutory period to file the federal petition."); *Pearson v. North Carolina*, 130 F. Supp. 2d 742, 744 (W.D.N.C. 2001) ("Every circuit to consider the question has agreed that proper calculation of Section 2244(d)(2)'s tolling provision excludes time during which properly filed state relief applications are pending but does not reset the date from which the one-year statute of limitations begins to run."); *Neal v. Bock*, 137 F. Supp. 2d 879, 884 (E.D. Mich. 2001) ("[T]olling in the habeas context does not reset the limitations clock."); *McGuinness v. Pepe*, 150 F. Supp. 2d 227, 233 n.13 (D. Mass. 2001) ("Section 2244(d)(2)'s tolling provision excludes time during which properly filed state relief applications are pending but does not reset the date from which the one-year statute of limitations begins to run."); *Leake v. Senkowski*, 274 F. Supp. 2d 588, 590 (S.D.N.Y. 2003) ("Proper calculation of Section 2254(d)(2)'s tolling provision excludes time during which properly filed state relief applications are pending but does not reset the date from which the one-year statute of limitations begins to run."); *Sorce v. Artuz*, 73 F. Supp. 2d 292, 294 (E.D.N.Y. 1999) ("The tolling provision of AEDPA . . . stops, but does not reset, the clock from ticking on the time in which to file a habeas petition. It cannot revive a time period that has already expired.").

take the position that Mr. Tsolainos can still timely file a federal habeas corpus petition under AEDPA's one-year limitations period, *see* Tsolainos Declaration ¶ 19, demonstrates conclusively that they failed to conduct "the research necessary to find out the proper filing date." *Holland*, 130 S. Ct. at 2564. Under *Holland*, therefore, Mr. Tsolainos is entitled to equitable tolling for this reason alone.

But Mr. Tsolainos has an even stronger claim given his attorneys' failure to follow his instructions to file the state post-conviction petition at the earliest possible date. *See* Tsolainos Declaration ¶¶ 6, 7, 10, 12. As several courts have explained, an attorney's failure to follow the client's instructions is the type of extraordinary circumstance that warrants equitable tolling. *See, e.g.*, *Downs v. McNeil*, 520 F.3d 1311, 1323-24 (11th Cir. 2008); *United States v. Martin*, 408 F.3d 1089, 1094-95 (8th Cir. 2005); *Spitsyn v. Moore*, 345 F.3d 796, 801 (9th Cir. 2003); *Baldayaque v. United States*, 338 F.3d 145, 152 (2d Cir. 2003). "By refusing to do what was requested by his client on such a fundamental matter, [the attorney] violated a basic duty of an attorney to his client." *Baldayaque*, 338 F.3d at 152. Here, despite numerous requests from Mr. Tsolainos to not delay filing his petition for state post-conviction relief, his lawyers chose to wait until the last possible opportunity under state law to submit it to the court. Tsolainos Declaration ¶ 7. Had they followed Mr. Tsolainos's instructions, there likely would have been no need for equitable tolling in light of the fact that the state petition for post-conviction relief was filed only 42 days after the AEDPA deadline had expired.

Moreover, the lack of communication between Mr. Tsolainos and his attorneys during the state post-conviction proceeding—and, ultimately, during the period in which his federal petition was to be prepared—further demonstrates his counsel's grossly negligent conduct. *See Holland*, 130 S. Ct. at 2564 (failure of counsel to communicate with petitioner about status of case is

relevant to equitable tolling inquiry); *see also, e.g.*, *Baldayaque*, 338 F.3d at 152-53; *Spitsyn*, 345 F.3d at 800-02; *Martin*, 408 F.3d at 1093-95; *Vasquez v. United States*, No. 09-CIV-3845, 2010 WL 3304256, at *2 (S.D.N.Y. Aug. 19, 2010). Mr. Tsolainos, understandably anxious to file the federal habeas corpus petition that was hailed as his best chance for overturning his conviction, attempted to contact his counsel regularly to discuss the status of his case and to receive assurances that his petition would be filed as soon as possible. Tsolainos Declaration ¶¶ 8, 12. Yet he found it nearly impossible to reach Ms. Abramson (the only attorney who remained on the case from the trial team) and increasingly difficult over time to reach Mr. Abramson (a difficult enough process given his inability to receive phone calls in prison or to leave messages for his attorneys on answering machines or voice mail). *Id.*

Finally, even when Mr. Tsolainos was able to reach the Abramsons, he was merely given token assurances that they were preparing the federal petition and that it would be timely filed. *Id.* As explained above, of course, the assurance that the petition would be timely filed was premised on an utterly incorrect interpretation of the governing statute. But perhaps even more troubling, it appears that prior counsel misled Mr. Tsolainos into believing that they were diligently preparing the federal petition when they were not. *Id.* ¶¶ 11-12. Indeed, despite accepting $250,000 in legal fees for that purpose (approximately $97,000 of which Phelps Dunbar has now refunded to the Trust), it appears that no federal habeas corpus petition was ever drafted by prior counsel. *Id.* ¶ 17; Vagelos Declaration ¶ 12. As the Fifth Circuit and other federal courts have explained, equitable tolling is especially warranted when post-conviction counsel misleads the client as to the status of the federal habeas petition. *See, e.g.*, *Wynn*, 292 F.3d at 228-229; *Martin*, 408 F.3d at 1096; *Vineyard*, 125 F. App’x at 552.

In sum, there can be no debate that Mr. Tsolainos's federal habeas petition was not timely filed due to prior counsel's failure to perform the basic tasks—conducting elementary research, following the client's instructions, communicating with their client on a regular basis, and candidly informing him as to the progress of his federal habeas petition—that the Supreme Court recently has made clear are expected of post-conviction counsel. Given his attorneys' professional reputations, repeated assurances, as well as the sizable amount of money he was paying them, Mr. Tsolainos had every reason to trust that his interests were being protected. Yet, absent equitable tolling, his best chance at overturning a fundamentally flawed conviction may have been lost several years ago without his knowledge. It is for this reason that district courts are granted wide latitude to toll AEDPA's limitations period, as it would be highly inequitable to force Mr. Tsolainos to bear the burden of his counsel's malfeasance here. After *Holland*, the governing standard for "extraordinary circumstances" comfortably includes the kind of grossly negligent attorney conduct present in this case.

### B. Mr. Tsolainos Exercised Reasonable Diligence in Acting to Preserve His Rights.

To obtain equitable tolling, the Supreme Court also requires a showing of "reasonable diligence" in pursuing federal habeas corpus relief once a petitioner discovers that his federal petition is overdue. *See Holland*, 130 S. Ct. at 2565. "Reasonable" diligence, the Supreme Court has instructed, is *not* "'maximum feasible diligence.'" *Id.* (quoting *Starns v. Andrews*, 524 F.3d 612, 618 (5th Cir. 2008)) (other quotation omitted); *see also Wims v. United States*, 225 F.3d 186, 190 n.4 (2d Cir. 2000) (holding that only "'due,' or reasonable, diligence" is required); *Moore v. Knight*, 368 F.3d 936, 940 (7th Cir. 2004) (explaining that the "due diligence inquiry should take into account that prisoners are limited by their physical confinement"). Here, Mr. Tsolainos persisted throughout the course of his prior representation in requesting that his

petitions be filed in a timely manner and as soon as practicable. He showed the utmost diligence under the circumstances, constantly contacting his attorneys to ensure that the proper procedures were being followed. *See* Tsolainos Declaration ¶¶ 6-12.

From February 2005 until quite recently when he terminated his representation by Phelps Dunbar and Ms. Abramson, Mr. Tsolainos held the belief, based on his attorneys' legal advice, that his federal habeas corpus petition was not due until one year after his state post-conviction proceedings concluded—in this case, October 9, 2010. *Id.* ¶¶ 10, 15, 19. Nevertheless, after terminating his representation with the Abramsons, he immediately contacted Mr. Stern and asked him to return to the case; and Mr. Stern did so immediately. *Id.* ¶ 17-18. Mr. Stern then advised Mr. Tsolainos that the petition was in fact overdue. Thus, it was not until then that Mr. Tsolainos's diligence obligation was triggered. At that point, Mr. Tsolainos retained new counsel to assist Mr. Stern in preparing his federal petition. Mr. Tsolainos filed this petition shortly thereafter. No more diligence could be expected of Mr. Tsolainos under the circumstances. *See, e.g.*, *Mathis*, 2010 WL 3278609, at *10 (acting to preserve rights shortly after each procedural turn in case demonstrated diligence necessary for equitable tolling); *Holland*, 130 S. Ct. at 2565 (holding that the fact that the petitioner "wrote his attorney numerous letters seeking crucial information and providing direction" demonstrated necessary diligence); *cf. Phillips v. Donnelly*, 216 F.3d 508, 511 (5th Cir. 2000) (finding that filing a petition within one month of discovering that the petition was late satisfied even the more stringent "maximum feasible" diligence standard).

In the end, the dismissal of a first federal habeas petition is a "particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty." *Lonchar v. Thomas*, 517 U.S. 314, 324 (1996). Given

that this petition is untimely through no fault of Mr. Tsolainos, but rather due to prior counsel's gross negligence, and because Mr. Tsolainos has exercised reasonable diligence in pursuing his request for federal habeas relief, this Court should exercise its discretion to equitably toll the limitations period and consider the petition on its merits.

## IV. CLAIMS FOR RELIEF

Under AEDPA, a federal habeas petition shall be "granted with respect to any claim that was adjudicated on the merits in State court proceedings" when the state court's decision (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's decision is "contrary to clearly established federal law if it applies a rule that contradicts the governing law set forth in Supreme Court cases or if the state court decides a case differently than the United States Supreme Court previously decided a case on a set of nearly identical facts." *Jones v. Cain*, 600 F.3d 527, 535 (5th Cir. 2010) (citations and internal quotation marks omitted). "When applying the 'unreasonable application' clause, 'a court may grant habeas relief if the state court misapplied the relevant legal principles to the facts.'" *Id.*

Although a "federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system," the Supreme Court has stressed that "deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Indeed, AEDPA "directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of

federal law." *Williams v. Taylor*, 529 U.S. 362, 389-90 (2000) (plurality opinion). Moreover, "the AEDPA-mandated deference to state court decisions does not apply if the petitioner properly exhausted his claim by raising it in the state court, but the state court did not adjudicate that particular claim on the merits." *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009). The federal court will instead "review such claims *de novo* without applying AEDPA-mandated deference." *Id.*

### A. **The Trial Court Violated Mr. Tsolainos's Sixth Amendment Right to Confront the Witnesses Against Him by Admitting a Confidential Informant's Out-Of-Court Testimony.**

The trial court's admission of hearsay testimony from Charles "Tinker" Schmolke, a confidential informant, violated Mr. Tsolainos's Sixth Amendment right to confront this witness at trial. The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. It is clearly established federal law that "[t]he Confrontation Clause guarantees a criminal defendant the right to cross-examine the witnesses against him." *Burbank v. Cain*, 535 F.3d 350, 357 (5th Cir. 2008). By upholding Mr. Tsolainos's conviction despite the evident violation of his constitutional rights under the Confrontation Clause, the state court's decision was contrary to clearly established federal law.

The Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), governs Mr. Tsolainos's Confrontation Clause claim.[6] In *Crawford*, the Supreme Court held that the

---

[6] The Supreme Court's *Crawford* decision applies here rather than *Ohio v. Roberts*, 448 U.S. 56 (1980), the ruling it overturned, because *Crawford* was issued before Mr. Tsolainos's conviction became final on direct appeal. *Lave v. Dretke*, 444 F.3d 333, 335 (5th Cir. 2006) ("Because *Crawford* changed the test for the admissibility of certain out-of-court statements, it imposes new obligations on state and federal courts and qualifies as a new rule of criminal procedure."). As a new rule, *Crawford* applies to all criminal appeals that were not yet final when the decision was issued. *Griffith v. Kentucky*, 479 U.S. 314, 322 (1987). *Crawford* was decided on March 8, 2004, and the Supreme Court of the United States did not deny Mr.

Confrontation Clause allows the admission of "testimonial" statements of witnesses absent from trial "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 59. As the Court explained, the term testimonial must apply "at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations," *id.* at 68, because statements made in these contexts "would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 52 (quotation omitted). And, in *Davis v. Washington*, 547 U.S. 813 (2006), the Supreme Court clarified that statements are "testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822.

Applying *Crawford*, several courts have held that the admission of out-of-court testimony by confidential informants strikes at the heart of the Confrontation Clause. The clear weight of authority holds that "statements of a confidential informant are testimonial in nature and therefore may not be offered by the government to establish the guilt of an accused absent an opportunity for the accused to cross-examine the informant." *United States v. Cromer*, 389 F.3d 662, 670-71 (6th Cir. 2004); *see also United States v. Holmes*, --- F.3d ----, No. 09-2789, 2010 WL 3431830, at *3 (8th Cir. Sept. 2, 2010) ("The statements made by the CI to Officer Singh that led to Officer Singh's further investigation of Holmes clearly fall within the class of

---

Tsolainos's petition for a writ of certiorari until February 28, 2005. The Louisiana Supreme Court had the opportunity to apply *Crawford* on direct appeal, but the court declined the writ application. In any event, the Louisiana appellate court applied *Crawford* in denying Mr. Tsolainos's request for post-conviction relief. *Tsolainos*, 997 So. 2d at 48. As a consequence, there can be no question that *Crawford* controls the resolution of whether Mr. Tsolainos's rights under the Confrontation Clause were violated. *See Danforth v. Minnesota*, 552 U.S. 264, 275-81 (2008).

statements considered testimonial."); *United States v. Lopez-Medina*, 596 F.3d 716, 730 (10th Cir. 2010) ("A confidential informant's statements to a law enforcement officer are clearly testimonial."). These courts have correctly recognized that "[s]tatements 'made to the authorities who will use them in investigating and prosecuting a crime, . . . made with the full understanding that they will be so used,' are precisely the sort of accusatory statements the Confrontation Clause was designed to address." *Cromer*, 389 F.3d at 674.[7] The Fifth Circuit, for example, has held that the admission of a confidential informant's out-of-court testimony is a constitutional error warranting a new trial. *See United States v. Rodriguez-Martinez*, 480 F.3d 303, 307 (5th Cir. 2007) (per curiam) (explaining that the "Government concede[d] that the confidential informant's out-of-court identification of Rodriguez-Martinez as the drug source is testimonial hearsay inadmissible under *Crawford v. Washington*").

Here, the trial court permitted the State to introduce several out-of-court statements by a confidential informant, Charles "Tinker" Schmolke, who provided information to the police concerning the alleged conspiracy to murder Deborah Tsolainos and who was wired to procure damaging testimony for later use against Mr. Tsolainos. This conspiracy evidence was central to the State's effort to satisfy the only contested element at trial—specific intent to kill. Mr. Schmolke gave "testimony" against Mr. Tsolainos; he was not available for cross-examination at trial because he had committed suicide prior to trial; and Mr. Tsolainos never had a prior opportunity to cross-examine him. As explained below, Mr. Tsolainos's criminal conviction

[7] The Supreme Court's decision in *Bourjaily v. United States*, 483 U.S. 171 (1987), is not to the contrary. In that decision, the Court found the admission of the out-of-court statements by a co-conspirator did not violate the Confrontation Clause because the statements were made "in the course and in furtherance of the conspiracy." *Id.* at 183. In this case, Mr. Schmolke's statements could not be admitted under this rationale because he was a government informant and therefore not a member of the alleged conspiracy. *See State v. Kihnel*, 488 So. 2d 1238 (La. Ct. App. 1986) (holding that there was no conspiracy where the alleged co-conspirators were a state informer and an undercover police officer).

should be set aside in light of the Louisiana Court of Appeal's failure to rectify several Confrontation Clause violations.

1. <u>The Trial Court Violated the Confrontation Clause by Admitting Mr. Schmolke's Tape-Recorded Testimony to Detective Artigue.</u>

The trial court admitted a tape-recorded statement in which Mr. Schmolke gave "a brief synopsis to [Detective] Richie Artigue of what transpired" during his conversation with Mr. Branigan. Trial Tr. vol. V, 1365:9-10, Oct. 15, 1999 (testimony of Scallan). The jury listened as Mr. Schmolke implicated Mr. Tsolainos in the conspiracy by stating that Tsolainos had offered Mr. Branigan money to kill his ex-wife —"$5,000"—had suggested a way to carry out the murder—"he wants us to OD her"—and had promised to provide them with a picture to identify her:

Det. Artigue: I couldn't hear it, tell me what he said. Leave that on, tell me what he said.

Tinker: He said, I told him, he said $2500 up front, and I told him I want half of that and last name, he got that on the recorder. I don't remember it, she's uh, Greek, he wants us to OD her, so he's gonna give us $2500 up cash, up cash up front, and the other $2500 after it's done.

Det. Artigue: So you ain't gonna get $5,000 for the deal?

Tinker: No, I'm gonna get $2500.

Det. Artigue: I thought you said he's gonna give you $2500 and $2500.

Tinker: Well, that's what he told me. I thought he didn't mean it. He told me at first, $7,000 so I figured I had to say, bra, you are gonna have to at least break me off three . . . . I mean, but he said "No. I'm getting paid $5,000 for the whole job." I was like oh, alright. Well, then he said uh, I said well, 25, 25, 50/50. I said that will work. He said we'll fucking uh, take a bus up there, and we'll fuck with the money we got we'll buy a cheap little piece of shit car, and we'll get pictures and shit tonight of her and so I can get the car information place.

Det. Artigue: Where are you going to get pictures of her, from the husband.

Tinker: Uh. Panos, that's her husband.

* * *

Tinker: But uh, sound like a real deal.

Det. Artigue: But he wouldn't give you any money up front.

Tinker: He said the dude is supposed to be bringing the $2500 tonight.

Det. Artigue: Tonight?

Tinker: Tonight.

Det. Artigue: And the pictures?

Tinker: And the pictures, and I told him he had to give me $1250. He says he's going on the boat for one night with this old lady's dad, and he'll be back tomorrow. And he'll give me my $1250 and show me the pictures and shit…well, that might be tonight I'll be getting all that information for you.

S. 52-53.

Mr. Schmolke's statements to Detective Artigue were clearly testimonial because they were "made to the authorities who will use them in investigating and prosecuting a crime" and "with the full understanding that they will be so used." *Cromer*, 389 F.3d at 674. There was no "ongoing emergency" when Mr. Schmolke gave his synopsis to Detective Artigue because the "primary purpose" of his statements were to "prove past events," *i.e.*, that Mr. Tsolainos had contracted to have his ex-wife killed, that were "potentially relevant to later criminal prosecution" of Mr. Tsolainos. *Davis*, 547 U.S. at 822; *see also id.* at 829-30 (holding that statements to police after emergency had passed were testimonial because they were primarily for the purpose of gathering facts to use in a criminal prosecution); *Jones*, 600 F.3d at 539

(holding that the admission of a nontestifying witness' recorded statements violated the Confrontation Clause).

Indeed, this case is a perfect illustration of the "unique potential for prosecutorial abuse" in using the out-of-court testimony of a confidential information to establish guilt. *Crawford*, 541 U.S. at 56 n.7. Detective Scallan testified that Mr. Schmolke was an informant who was "to be paid on a contingency basis"—in other words, he would be paid for "results." Trial Tr. vol. VI, 1408:32-1409:9, Oct. 16, 1999 (testimony of Scallan). Detective Scallan "knew that his motivation would be money," *id.* at 1413:10, and Mr. Schmolke was acting on Detective Scallan's promise that "I will compensate you monetarily" for providing evidence against Mr. Tsolainos. Trial Tr. vol. V, 1376:7, Oct. 15, 1999 (testimony of Scallan). Mr. Schmolke was just the kind of person who would be persuaded by this kind of incentive. Detective Scallan testified that Mr. Schmolke was an unsavory character who was "always drunk" and "always loaded." Trial Tr. vol. VI, 1418:14-15, Oct. 16, 1999 (testimony of Scallan). He was an "alcohol abuser" and a "prescription drug abuser." Trial Tr. vol. V, 1375:11-15, Oct. 15, 1999 (testimony of Scallan). Thus, even though Mr. Schmolke was not "a person of great moral character," *id.* at 1375:8-10, Detective Scallan allowed him to play a central role in the investigation and prosecution of Mr. Tsolainos.

For these reasons, Mr. Tsolainos argued in his state petition for post-conviction relief that the admission of Mr. Schmolke's taped-recorded statements to Detective Artigue violated the Confrontation Clause. The Louisiana Court of Appeal, however, declined to address the merits of this particular claim. Accordingly, this claim is reviewed *de novo* because no AEDPA deference is due. *See Carty*, 583 F.3d at 253. In sum, the Court should grant the writ because the trial court's admission of highly prejudicial out-of-court testimony of a confidential

informant—who provided incriminating testimony for a prospective criminal trial against Mr. Tsolainos with the financial incentive to ensure a conviction—violates the Confrontation Clause under the Supreme Court's decisions in *Crawford* and *Davis*.

2. <u>The Trial Court Violated the Confrontation Clause by Allowing Detective Scallan to Repeat Mr. Schmolke's Out-Of-Court Statements.</u>

The trial court permitted Detective Scallan to testify that when Mr. Schmolke was first presented to him "he was basically scared that he was going to be under arrest by the Sheriff's Department for a hit on Panos Tsolainos's wife, and that's when I started questioning him." Trial Tr. vol. V, 1360:27-30, Oct. 15, 1999 (testimony of Scallan). Detective Scallan also testified that when he overheard Mr. Schmolke's first conversation with Mr. Branigan that it "corroborated what Schmolke had initially told [me] was going to take place." *Id.* at 1363:11-13. Detective Scallan further testified that, after Mr. Schmolke's meeting with Mr. Branigan was concluded, Mr. Schmolke told him that "they were supposed to meet. Mr. Branigan was going to go to Tsolainos' house that night." *Id.* at 1373:31-32.

Each of these statements by Mr. Schmolke, repeated at trial by Detective Scallan, were testimonial within the meaning of *Crawford* and *Davis* because, again, Mr. Schmolke made them "to the authorities who will use them in investigating and prosecuting a crime" and "with the full understanding that they will be so used." *Cromer*, 389 F.3d at 674. The trial court simply allowed Detective Scallan to repeat to the jury the testimonial statements made to him by Mr. Schmolke. "Allowing agents to narrate the course of their investigations, and thus spread before juries damning information that is not subject to cross-examination, would go far toward abrogating the defendant's rights under the sixth amendment and the hearsay rule." *United States v. Silva*, 380 F.3d 1018, 1020 (7th Cir. 2004). For this reason, courts have "warned

against the potential for abuse when police testify to the out-of-court statements of a confidential informant." *Id.*

The Louisiana Court of Appeal found no Confrontation Clause violation in Detective Scallan's repetition of Mr. Schmolke's statements to the jury because Mr. Tsolainos "did have the opportunity to cross-examine Detective Scallan at trial." *Tsolainos*, 997 So. 2d at 49. There can be no question that the state court's decision is thus both "contrary to" directly controlling Supreme Court precedent and an "unreasonable application" of existing precedent. As the Supreme Court explained in *Davis*, "we do not think it conceivable that the protections of the Confrontation Clause can readily be evaded by having a note-taking policeman *recite* the unsworn hearsay testimony of the declarant." 547 U.S. at 826 (emphasis in original). Yet that is precisely what the trial court permitted and what the appellate court endorsed on post-conviction review of Mr. Tsolainos's conviction. As the Fifth Circuit has explained, "[p]olice officers cannot, through their trial testimony, refer to the substance of statements given to them by nontestifying witnesses in the course of their investigation, when those statements inculpate the defendant." *Taylor v. Cain*, 545 F.3d 327, 335 (5th Cir. 2008). Directly contrary to *Taylor*, then, the Louisiana Court of Appeal upheld the trial court's unconstitutional decision to allow the investigating officer to repeat the substance of a nontestifying witness' inculpatory statements.

Put simply, under the Louisiana appellate court's theory, "every time a person says to the police 'X committed the crime,' the statement (including all corroborating details) would be admissible to show why the police investigated X. That would eviscerate the constitutional right to confront and cross-examine one's accusers." *Silva*, 380 F.3d at 1020 (citing *Crawford v. Washington*, 541 U.S. 36 (2004)). The Louisiana court's failure to correct this Confrontation Clause violation was an unreasonable application of clearly established federal law.

3. <u>The Trial Court Violated the Confrontation Clause by Admitting Mr. Schmolke's Tape-Recorded Statements to Mr. Branigan.</u>

Mr. Schmolke's tape-recorded statements to Mr. Branigan, in which he implicated Mr. Tsolainos in the conspiracy, are testimonial because he was working directly with the police for the sole purpose of "the production of testimony with an eye toward trial." *Crawford*, 541 U.S. at 56 n.7. The Confrontation Clause analysis with respect to this claim is identical to the challenge to the trial court's admission of Mr. Schmolke's statements to Detective Artigue and Mr. Schmolke's statements to Mr. Branigan. In all three instances, the trial court admitted testimony from an out-of-court witness who was unavailable at trial and whom Mr. Tsolainos never had a prior opportunity to cross-examine. In this instance, the trial court admitted the following discussion between Mr. Schmolke and Mr. Branigan into evidence:

Tinker: How the fuck are we going to get there?

Gerald: Well, he's putting up $2500 cash first, and another $2500….

Tinker: Cause I want some of my funds up front so I know I ain't getting fucked.

Gerald: Well, listen, he's going to put $2500 cash up front.

Tinker: Not me, I like to know a little bit about what's going down. I mean what the fuck, we going fucking, we going fucking, this bitch is gonna disappear off the face of the earth? Or is she going to fucking….

Gerald: We're gonna OD her ass.

Tinker: OD her ass?

Gerald: She's a heroin addict, so I figure we're gonna OD that mother fucker. The old man wouldn't call him.

* * *

Gerald: This is his old lady, his ex-wife, she lives all by herself. She lives by herself.

Tinker: She ain't gonna have no guns, or nothing, we ain't got to worry about that.

Gerald: No, supposedly, he's supposed to give me some pictures with some information where she's at, where she hangs out at….

Tinker: Cause I won't go in there all blind folded and shit. Bro, when I go in there, when I go to do this job, I want to do it right.

Gerald: Well, supposedly there ain't nothing to it, her mother's daughter is out of the picture, his daughter's moved back down here. So it ain't gonna be no problem.

Tinker: Well, I don't want nothing with her daughter.

Gerald: Yeah. She ain't gonna be there. Yeah, she's 20 something years old, she moved. She already moved back to New Orleans, so there's ain't nothing but her momma there. So that's why I thought….

Tinker: No, I'm thinking more along the lines, bro, you can pay me off cheap, 3, $3,000, and I'd like at least $250, $500 up front.

Gerald: You telling me tonight, bro, you want $2500 straight up front?

Tinker: Split that with me, and we'll do some business. I want the money I wanna see, bro. Cause I ain't going to do no job for nobody unless I'm getting paid.

Gerald: We'll split $2500 but if you want to come, we can both go up there and go.

Tinker: Look, I'm game bro. My old lady is giving me more shit. I wasn't gonna do it bro but as I showed you I come over eat your shit, stuck a knife in your fucking throat, so you know we can fucking do this. After you pulled that switchblade on me, I mean, that's all good, tho, but we can go do this.

Gerald: Yeah, I'm gonna talk to him tonight brother, and we can sure will. I called him last night and he's way in Marerro, he lives up here somewhere. In fact, he bunks here, he's got money coming out his ass.

Tinker: He got more money that he knows what the fuck to do with.

Gerald: I told him straight up, you know what, sorry about that but I want $2500 up front and $2500 when I come back. He said go.

Tinker: You only getting paid five? I thought you said seven.

Gerald: No, he's giving me $5,000 grand to do the job.

Tinker: Oh so you were going 25 slipped him. I ain't trying to get in your business or nothing, but what's the bitches' nanny, or do I need to know all that?

Gerald: I don't know her first name, but her last name is Tsolainos, probably Greek.

Tinker: Tsolainos?

Gerald: Yeah. She's got a fucking track all the way up and down her arm, supposedly fuck, she's a heroin addict….

Tinker: So she needs to be popped.

Gerald: Yeah, she needs a little extra dope that's all. We can put her out cause she's trying to fuck with the kids and shit, trying to take them all away, and fuck, taking all kind of money that he's got and shit, and he said fuck it. I just as soon give her that fucking dose send her on and say goodbye.

Tinker: Hahaha. I hear you, bro. Ain't nothing to it.

* * *

Tinker: I want to know how many times a day that bitch takes a shit. I want to know everything.

Gerald: How much fucking dope she does a day, that close…if she does a fucking couple of hundred dollars of heroin a day, we can really knock that mother fucker off.

Tinker: St. Louis?

Gerald: Huh? Yeah, she's in St. Louis.

Tinker: How far is St. Louis from this mother fucker? It's a good ride.

Gerald: A good ways. I figured we could catch a bus up there.

Tinker: Catch a bus?

Gerald: Yeah, catch a Greyhound bus. We could go up there and ride around, mother fucker, take care of her, get rid of the mother and come back. At first I thought….

Tinker: I thought about it the other day when I told you no, but you just kind of caught me by surprise, you understand, I didn't know what to expect. I didn't know what it stuck to, dig?

Gerald: Yeah, I'm supposed to get all kinds of pictures and shit tonight, either tonight, or….

Tinker: If you get the pictures, I want to see some of them too. So I know who I am going to get, straight up. But I don't need to know, you know.

* * *

Tinker: Yeah, we'll go do this, bro. You gotta let me know. Those pictures. Those pictures and cash … gotta see those pictures.

Gerald: Yeah. Cool then.

S-53 (punctuation added).

The Louisiana Court of Appeal found the admission of the tape-recorded statements "between a confidential informant [Schmolke] and one of defendant's co-conspirators [Branigan]" did not raise a Confrontation Clause issue because "surreptitiously monitored conversations and statements are not 'testimonial' for purposes of *Crawford*." *Tsolainos*, 997 So. 2d at 48-49 (citing *United States v. Hendricks*, 395 F.3d 173, 181 (3d Cir. 2005)). But the state court's analysis is woefully inadequate because it ignored the Confrontation Clause implications of admitting out-of-court statements of a confidential information purposefully made with an eye toward prosecution, while focusing only on the alleged co-conspirator who admittedly was not giving "testimony."

The courts that have found surreptitiously monitored statements contained in recordings are not "testimonial" for purposes of *Crawford* have done so because the "very purpose" of a

surreptitious recording "is to capture conversations that the participants believe are not being heard by the authorities and will not be available for use in a prosecution." *Hendricks*, 395 F.3d at 181. Unlike in those cases, however, Schmolke *knew* he was being recorded when he used the electronic recording device as an agent of the police to procure damaging testimony to be used prosecutorally, and his statements cannot be described as the kind of "casual remark" contemplated by the cases relied upon by the state court. *Id.*[8] "[O]btaining evidence for the prosecution is, after all, the *raison d'être* of being a confidential informant." *Id.* at 182. As a result, the state court unreasonably applied clearly established federal law when it found no Confrontation Clause violation with respect to Mr. Schmolke's statements to Mr. Branigan.

In sum, each of these Confrontation Clause violations independently warrants habeas relief from this Court. Each statement from Mr. Schmolke was critical to the State's effort to establish that a conspiracy existed and that Mr. Tsolainos acted with specific intent to kill. None of the statements should have been admitted at trial because Mr. Schmolke was never subject to cross-examination. And, without the admission of these statements, the State's evidence that Mr. Tsolainos acted with specific intent would have been left in shambles.

---

[8] In *Hendricks*, the Third Circuit considered Title III wiretaps that intercepted "multiple conversations between the various Defendants and other third parties." 395 F.3d at 181. The court held "that the surreptitiously monitored conversations and statements contained in the Title III recordings are not 'testimonial' for purposes of *Crawford*" because each of the examples of testimonial statements given by the *Crawford* Court "entails a formality to the statement absent from the recorded statements at issue here." *Id.* Unlike *Hendricks*, which involved the surreptitious recording of unwitting individuals, this case involves a confidential informant who knowingly wore an electronic recording device to further the prosecution's case against Mr. Tsolainos. Moreover, the Third Circuit relied upon the statements' level of "formality" as a proxy for "testimonial," which the Supreme Court later rejected in *Davis*. *See* 547 U.S. at 830 (noting that the level of formality "certainly strengthen[s] the statements' testimonial aspect" but is not "essential to the point").

## B. Mr. Tsolainos Was Denied a Fair Trial by an Impartial Jury.

"The Sixth Amendment secures to criminal defendants the right to trial by an impartial jury." *Skilling v. United States*, 130 S. Ct. 2896, 2912-13 (2010). A fair trial in a fair tribunal is also a "basic requirement of due process." *Id.* at 2913 (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("The failure to accord an accused a fair hearing violates even the minimal standards of due process."). Indeed, it is clearly established federal law that a "defendant is entitled to a fair trial by an impartial jury which will render its verdict based upon the evidence and arguments presented in court without being influenced by outside, irrelevant sources." *United States v. Chagra*, 669 F.2d 241, 249 (5th Cir. 1982), *overruled on other grounds*, *Garrett v. United States*, 471 U.S. 773 (1985). In this case, Mr. Tsolainos's constitutional right to a fair trial by an impartial jury was violated for two independent reasons: first, the intense pretrial publicity created a presumption of juror prejudice, and, second, the *voir dire* demonstrated that the jury was actually biased against Mr. Tsolainos. *See Skilling*, 130 S. Ct. at 2907. Because Mr. Tsolainos was denied this right to a fair trial, the Louisiana Court of Appeal's decision was an unreasonable application of federal law warranting habeas relief from this Court.[9]

### 1. Pretrial Publicity of Mr. Tsolainos's Conspiracy and Murder Arrests Created a Presumption of Juror Prejudice.

If a petitioner "can demonstrate that prejudicial, inflammatory publicity about his case so saturated the community from which his jury was drawn as to render it virtually impossible to

[9] The Louisiana Court of Appeal rejected Mr. Tsolainos's contention on direct appeal that he did not receive a fair and impartial trial. *Tsolainos*, 864 So. 2d 905, at *29. The Court of Appeal recognized that Mr. Tsolainos "successfully showed that there was extensive media coverage and general knowledge within the community about the basic facts of the case," but concluded that he had "failed to present sufficient evidence of an overriding prejudice within the community's collective mind that prevented him from receiving a fair trial." *Id.*

obtain an impartial jury," then "[p]roof of such poisonous publicity raises a presumption that appellant's jury was prejudiced, relieving him of the obligation to establish actual prejudice by a juror in his case." *Chagra*, 669 F.2d at 250. Important factors for determining prejudice include, among others, the amount of media coverage; whether there was inflammatory reporting, such as editorials and sensationalized stories; whether the public heard the defendant's confession; and whether the coverage was so continuous that the community's passions never cooled. *See id*; *Skilling*, 130 S. Ct. at 2915-16.

As explained below, a presumption of prejudice exists in this case. Stories of Mr. Tsolainos's alleged crimes were constant and inflammatory and continued until the date of his trial; reports that Mr. Tsolainos had confessed to his alleged crimes were frequent and particularly damaging. Indeed, the media reported that Mr. Tsolainos had confessed to hiring a hitman to kill his wife and had confessed to killing her himself. Editorials, detailed reporting of his past, and sensationalized coverage also added to the community's outrage. In short, after more than a year of intense media coverage, Mr. Tsolainos's trial was nothing more than a "hollow formality." *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963).

a. The Media's Coverage of Mr. Tsolainos's Confessions Was Extremely Prejudicial.

The Supreme Court has repeatedly emphasized the extremely prejudicial nature of confessions played through the media. In that vein, the Court has cautioned that "the defendant's own confession [is] probably the most probative and damaging evidence that can be admitted against him." *Parker v. Randolph*, 442 U.S. 62, 72 (1979) (quotation marks omitted). A confession is the kind of "blatantly prejudicial information [that] readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 130 S. Ct. at 2916. In *Rideau*, for example, the Supreme Court reversed a conviction because the community from which the jury was drawn

was exposed three times to the spectacle of the defendant confessing to his crimes. 373 U.S. at 726 (explaining that this spectacle "in a very real sense was Rideau's trial—at which he pleaded guilty to murder"). Confessions are prejudicial because of the credibility a listener attaches to them. As the Fifth Circuit has held, "[a] jury may have difficulty in disbelieving or forgetting a defendant's opinion of his own guilt but have no difficulty in rejecting the opinions of others because they may not be well-founded." *Chagra*, 669 F.2d at 252 n.11. *Compare Skilling*, 130 S. Ct. at 2916 (noting that news stories "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight" (citing *Chagra*, 669 F.2d at 251-52 n.11)).

Here, the media's publication of Mr. Tsolainos's alleged confessions to conspiracy and murder were extremely prejudicial to his defense. Prospective jurors repeatedly heard that Mr. Tsolainos had admitted to hiring a hitman to kill his wife and had admitted to killing his wife himself. In particular, they heard: (1) a sheriff spokesman announce that "[a]ll three [coconspirators] have admitted to their involvement in the plan" to commit murder, Bob Anderson, *St. Tammany Deputies Arrest Relatives in Murder Plot*, The Advocate, July 9, 1998, at 3B; (2) Mr. Tsolainos had "admitted his involvement in the crime," Ron Thibodeaux, *Judge Has Some Explaining To Do*, The Times-Picayune, July 25, 1998, at B7; (3) a special prosecutor claim that Judge Hedges "knew this guy was going to murder his wife" because "[a] deputy had played a tape for Hedges on which Tsolainos was heard conspiring to kill the woman," *Hedges, Four Others Surrender in Bribery, Extortion Case*, The Associated Press, Oct. 10, 1998; (4) Mr. Tsolainos's daughter Clarissa stated that he "said he was gonna do it [murder his wife] and he did it," Jarvis DeBerry, *Murder Suspect Again Awaits Bail; Charge Reduced to Second-Degree*, The Times-Picayune, Apr. 27, 1999, at A1; and (5) Mr. Tsolainos confessed to an officer, "I

killed my old lady, what can I say?" Jarvis DeBerry, *Tsolainos Not Delusional While Confessing, Detective Says; Defense Challenges Murder Suspect's Offbeat Confession*, The Times-Picayune, Sept. 14, 1999, at A13. After repeatedly being told that Mr. Tsolainos had confessed his crimes, no juror could be expected to impartially consider whether Deborah Tsolainos's death was, as Mr. Tsolainos argued at trial, an accident.

The prejudicial impact of the media's reporting was exacerbated by the fact that most of the damaging statements were relayed to the public by law-enforcement officers, who carry particular credibility with the community. *See Rideau*, 373 U.S. at 725 (noting that the decision to broadcast the confession "was carried out with the active cooperation and participation of the local law enforcement officers"); *Coleman v. Kemp*, 778 F.2d 1487, 1538-39 (11th Cir. 1985) (finding a change of venue necessary where a law-enforcement official announced that the circumstantial evidence was "overpowering" and that there was "no point in looking for anybody else"). In short, this spectacle "in a very real sense was [Mr. Tsolainos'] trial—at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Rideau*, 373 U.S. at 726.

b. The Media's Coverage of the Facts was Sensationalized and Designed to Inflame the Community's Sense of Outrage.

Courts also focus on whether the media's reporting was fact-based and neutral, or whether passions were inflamed by, for example, "inflammatory editorials or cartoons." *Ainsworth v. Calderon*, 138 F.3d 787, 795 (9th Cir. 1998); *cf. Hale v. United States*, 435 F.2d 737, 748 (5th Cir. 1970) (focusing on, *inter alia*, the lack of "editorials or cartoons denounc[ing]" the defendant). The editorials in this case were particularly sensationalized. They accused Judge Hedges of bending the rules to free someone who "admitted his involvement in the crime" and intimated that because of her actions a mother of four was now dead. Ron

Thibodeaux, *Judge Has Some Explaining to Do*, The Times-Picayune, July 25, 1998, at B7; Editorial, *Hedging on the Rules*, The Times-Picayune, July 22, 1998, at B6. Additionally, the front page story entitled "Shattered Lives" functioned as an editorial cartoon. *Shattered Lives*, Slidell Sentry-News, Sept. 20, 1998. The headline featured Halloween-like print, as if the letters were dripping blood, and a subheading quoting Mr. Tsolainos's daughter as saying, "he was calm, just as calm could be. I begged him to help her. He looked at me calmly and said 'she's dead.'" In short, these editorials and headlines only served to incite passion in the prospective jurors who read them.

The media's reporting of the facts was similarly prejudicial. Mr. Tsolainos was rarely portrayed in a factually-neutral manner. He was labeled in extreme terms: *The Associated Press* named him a "wife-killer," *Lead Prospects Uncertain*, The Associated Press, Feb. 26, 1999, and a television report called him a "cold-hearted killer." He was reported as a continuing threat to society: his daughter was quoted as stating that "she believed that, because she witnessed the crime, her father would kill her if he were let out." Jarvis DeBerry, *Defendant Denied Request for Bail in Murder Case; Judge Says He Can Do It*, The Times-Picayune, May 21, 1999, at A1. He was characterized in the media as a cruel, heartless man who had hidden more than a million dollars from his family while his children remained "penniless," Jarvis DeBerry, *Murder Suspect's Children Sue Him*, The Times-Picayune, May 28, 1999, at A1; *Kids Want Damages From Dad Accused of Running Over Their Mother*, The Associated Press, May 28, 1999, and had killed his wife as the couple's children and grandchildren looked on, *see* Trial Tr. vol. I, 104-106, Oct. 11, 1999 (testimony of Hunter Downey Alessi). And he was reportedly a sociopath: "he was calm, just as calm as could be. I begged him to help her. He looked at me calmly and said 'she's dead.'" *Shattered Lives*, Slidell Sentry-News, Sept. 20, 1998. Such sensationalized

characterizations of Mr. Tsolainos foreclosed any possibility of drawing an impartial jury. As the verdict demonstrates, the jury clearly had no sympathy for Mr. Tsolainos. *Cf. Skilling*, 130 S. Ct. at 2916 (noting that the jury acquitted Skilling of nine counts, whereas in *Rideau*, *Estes*, and *Sheppard* "the jury's verdict did not undermine in any way the supposition of juror bias").

c. Media Coverage Saturated the Small Community of St. Tammany Parish up to the Day of the Trial.

The Supreme Court has also stressed that an important factor is whether media coverage was continuous, such that the community's passions were never allowed to cool. In *Sheppard v. Maxwell*, 384 U.S. 333 (1966), for example, the Supreme Court granted relief to a state prisoner based on pretrial publicity where the publicity continued almost unabated from the date of the alleged crime to the beginning of *voir dire*, *see id.* at 339-45; *see also Daniels v. Woodford*, 428 F.3d 1181, 1211 (9th Cir. 2005) (granting a state prisoner's habeas petition in part because "[t]he murders . . . generated extensive and nearly continuous publicity," and the prisoner "was identified in press accounts as the killer from the very beginning").

In this case, the barrage of media coverage characterizing Mr. Tsolainos as a murderer never subsided. The coverage was intense from the moment of Mr. Tsolainos's arrest for conspiracy in July 1998 and reached its peak in the month before his trial in October 1999. During that period the media covered all matters related to Mr. Tsolainos's case. *See Irvin*, 366 U.S. at 725-26 (describing how the media's coverage had spanned the gamut, from his previous crimes as a juvenile, to the fact that he failed his lie detector test). Put simply, there can be no question that the media's coverage here was far more intense than ordinarily would be the case for a murder trial. *Cf. Patton v. Yount*, 467 U.S. 1025, 1034 (1984) (finding no prejudice when the extensive and prejudicial media coverage occurred four years before the trial); *Murphy v. Florida*, 421 U.S. 794, 802 (1975) (finding no prejudice because the publicity had stopped

seven months before jury selection). Rather, prospective jurors in this case were under siege from a constant barrage of prejudicial media coverage from the date Mr. Tsolainos was arrested on the conspiracy charge to the date of his murder trial.

Moreover, all of this media coverage saturated the small community of St. Tammany Parish. The Supreme Court has "emphasized in prior decisions the size and characteristics of the community in which the crime occurred." *Skilling*, 130 S. Ct. at 2915. In *Rideau*, for example, the Supreme Court found that pretrial publicity had infected a Louisiana parish with only 150,000 residents. 373 U.S. at 724. *Compare Skilling*, 130 S. Ct. at 2915 (noting that there were more than 4.5 million individuals eligible for jury duty in Houston representing a "large, diverse pool of potential jurors"). Here, the trial court did not draw the jury from a large metropolis such as Houston, but a small community of 191,000 that had been blanketed with media coverage of Mr. Tsolainos's case. *See* Affidavit of Karen Paterson, State Demographer for the State of Louisiana, Exhibit A (Nov. 20, 2006) (2000 census data). As in *Rideau*, the small jury pool ensured that any juror would be exposed to prejudicial information.

d. <u>Polling Data Confirmed that Mr. Tsolainos Could Not Receive a Fair Trial in St. Tammany Parish.</u>

Polling data confirms that the media barrage had an overwhelming effect on the local community from which the jury would be drawn. Before trial, Mr. Tsolainos conducted extensive polling of St. Tammany, Washington, and Tangipahoa Parishes, surveying four hundred registered voters in each Parish. The results were startling. Overall, 72% of those polled recalled the facts of the case; in St. Tammany Parish, where the trial was held, the number was close to 83%. Trial Tr. vol. I, 41, Oct. 11, 1999 (testimony of Lawrence MacKenzie). Of those who had heard of the case, 74.7% thought that Mr. Tsolainos intended to kill his wife, while only 1.9% believed it was an accident. *Id.* at 33. And of those who had formed an

opinion, 94.5% thought he was guilty. *Id.* at 31. Remarkably, *none* of those polled believed Mr. Tsolainos to be innocent, a statistic the experienced polling expert testified was "quite rare." *Id.* *Compare Skilling*, 130 S. Ct. at 2915 n.15 (discussing survey data showing that only 12.3% of Houstonians named Skilling when asked to list Enron executives they believed guilty of crimes). Moreover, the open responses to the poll reflected the community's outrage. Individuals in the community called Mr. Tsolainos "evil," "very evil," "nuts," "psycho," and "warped." Trial Tr. vol. I, 98, Oct. 11, 1999 (testimony of Alessi). In recalling Mr. Tsolainos's actions, the public remembered that "he ran over [his wife] in front of the children"; "he laughed about it"; "that's murder"; and "he's crazy, he just killed her." *Id.* at 104. In describing the punishment he should receive, individuals stated that "he should be shot," and "he ran over his wife with a car; he should get the death penalty." *Id.* These findings are hardly surprising given the media coverage that created a presumption of prejudice. Under such circumstances, it was impossible for Mr. Tsolainos to receive a fair trial by an impartial jury.

2. Actual Prejudice Infected Mr. Tsolainos's Jury.

In light of the media coverage that permeated the local community, it is hardly surprising that the *voir dire* in this case detected actual bias in the jury.[10] Reversal of a conviction is independently warranted where there is "actual, identifiable prejudice attributable to the publicity in question on the part of a member of the jury which decided" the case. *Chagra*, 669 F.2d at 250 (citing *Irvin*, 366 U.S. at 723); *United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000)

---

10 The Louisiana Court of Appeal found no actual bias in the jury. "Although many of the prospective jurors responded that they were aware of the case, and some even indicated that the publicity they recalled was negative," the court found that "each individual juror assured the court that he or she would be able to set aside that information and decide the case based upon the law and the evidence presented at trial. Prospective jurors who indicated that they had formed an opinion that could not be set aside were excused for cause." *Tsolainos*, 864 So. 2d 905, at *29.

("[T]he seating of any juror who should have been dismissed for cause . . . require[s] reversal."); *Parker v. Gladden*, 385 U.S. 363, 366 (1966) (per curiam) ("[A] petitioner [is] entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors."). "Proof of such prejudice is normally made by reliance upon the juror's *voir dire* responses." *Chagra*, 669 F.2d at 250. The Supreme Court has also cautioned that "adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." *Patton*, 467 U.S. at 1031.

In *Irvin*, for example, the Supreme Court found actual juror bias warranted vacatur of a conviction where "a barrage" of publicity, including reports of confessions, was "unleashed against" the petitioner within a small rural community. 366 U.S. at 725-26. In light of the pretrial publicity, the Court noted that "the pattern of deep and bitter prejudice" in the community "was clearly reflected in the sum total of the *voir dire*" because almost 90% of prospective jurors entertained some opinion as to guilt and eight of the twelve jurors thought Irvin was guilty. *Id.* at 727. Although the jurors declared that they could be impartial, the Court held that "it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt." *Id.* at 728.

The evidence of actual bias attributable to pretrial publicity in the case at bar is just as striking as that in *Irvin* because the "build-up of prejudice" in the media predisposed potential jurors against Mr. Tsolainos. *Id.* at 725-26. As noted above, 42 of the 47 prospective jurors questioned—a sizeable majority (89%)—had been exposed to pre-trial publicity surrounding the case. *See* Trial Tr. vols. II-IV, Oct. 12-14, 1999; *Tsolainos*, 864 So. 2d 905, at *27; *see Sheppard*, 384 U.S. at 345 (noting that "[e]very juror, except one, testified at *voir dire* to reading

about the case in the Cleveland papers or to having heard broadcasts about it"); *Daniels*, 428 F.3d at 1212 (granting habeas petition in part because "the majority of actual and potential jurors remembered the pretrial publicity"). Although every venireman/woman testified that they could be impartial during general *voir dire*, their testimony in closed session *voir dire* demonstrated that many could not be. Many prospective jurors testified that they believed Mr. Tsolainos was guilty based upon what they had heard in the media.

For example, Mr. Jamos, who recalled from pretrial media exposure that Mr. Tsolainos "got out on a bond . . . got his car, went home, and his wife and his kids were in the driveway, and he run over his wife," stated that Mr. Tsolainos would have to disprove his initial conclusions to prove his innocence. Trial Tr. vol. II, 375:1-4, Oct. 12, 1999. Mrs. Schmidt stated that "[r]ight now, I feel that Mr. Tsolainos is guilty, just based on what I've read," *id.* at 391:11-12, and to run over "somebody you loved . . . [is] a heinous crime." *Id.* at 397:32-398:1. Ms. Sullivan knew Mr. Tsolainos "had run [his wife] over and that he killed her and that there was a restraining order," and felt Mr. Tsolainos would have to prove his innocence. *Id.* at 408:3-8, 412. Mr. Fontana heard that "someone was hired . . . to do the murder . . . and it was done in front of the children," and he would have required Mr. Tsolainos to prove that he did not kill his wife. Trial Tr. vol. III, 689, 693, Oct. 13, 1999. Mr. Aubin had heard Mr. Tsolainos was arrested and "assume[d] he [was] guilty at that point." *Id.* at 704:19-20. Ms. Talbott heard that "Mr. Tsolainos was charged with conspiring to kill his ex-wife. Shortly after that, he ran over her in the driveway of her home, in front of the children." Trial Tr. vol. IV, 1011:10-13, Oct. 14, 1999. Ms. Pratt criticized Judge Hedges's decision to release Mr. Tsolainos on bond. *Id.* at 1006.

Those selected to serve on the jury were similarly biased. Mr. Urbina (Juror Number 1) heard from his wife, who worked at the St. Tammany Sheriff's Office, that there was a "big" case in which "a husband had killed [his] wife." Trial Tr. vol. II, 402:29-31, Oct. 12, 1999. The mere fact that Mr. Urbina's spouse worked for the same Sheriff's Office that arrested Mr. Tsolainos—and whose deputies would be testifying at trial—should have alone been sufficient to strike him from the jury for bias. *See United States v. Scott*, 854 F.2d 697, 699 (5th Cir. 1988) (presuming bias and requiring a new trial where juror failed to disclose that his brother worked in sheriff's office).

In addition, Mr. Dugas (an alternate juror who later served on the jury) remembered the media's "one-sided" portrayals of the incident, Mr. Tsolainos's first arrest, and Judge Hedges's reduction of the bond. Trial. Tr. vol. IV, 1023, Oct. 14, 1999. Mr. Scharf (Juror Number 2) had heard that someone "ran over their wife." Trial Tr. vol. II, 430:14, Oct. 12, 1999. Mr. Townsend (Juror Number 3) had heard that "the defendant struck his wife with a car." *Id.* at 456:20-21. Mr. Berryhill (Juror Number 4) had heard of the case and knew that Judge Hedges had reduced the bond. *Id.* at 503:1-11. Ms. Ballex (Juror Number 5) heard "that there was a death, that someone had killed his wife." Trial Tr. vol. III, 658:23-24, Oct. 13, 1999. Mr. Cook (Juror Number 7) had been told that Mr. Tsolainos "struck his wife with a vehicle." *Id.* at 697:7-8. Mr. Call (Juror Number 8) recalled the case and knew that Judge Hedges had "released [Mr. Tsolainos] out on bond." *Id.* at 718:7. Mr. Orillion (Juror Number 9) had heard that "[Mr. Tsolainos] and his wife got in an argument . . . and he rolled over the car or hit her with his car." *Id.* at 726:14-16. Mr. Orillion also had heard that "Judge Hedges was the judge who lowered the bond on the man who got out of jail and went and killed his wife." *Id.* at 727:11-13. Mr. Roberts (Juror Number 10) remembered that "a guy ran over his wife with a car." *Id.* at 790:30-

31. Mr. Tower (Juror Number 12) recalled that "Mr. Tsolainos . . . allegedly had killed his wife with a car." Trial Tr. vol. IV, 995:8-9, Oct. 14, 1999. At bottom, the *voir dire* confirmed that pretrial publicity resulted in actual bias in Mr. Tsolainos's jury that deprived him of his constitutional right to a fair trial.

### C. <u>The State Violated Mr. Tsolainos's Due Process Rights by Knowingly Using False Testimony.</u>

"The Due Process clause of the Fourteenth Amendment forbids the government from knowingly using, or failing to correct, false testimony." *United States v. Gonzales*, 436 F.3d 560, 580 (5th Cir. 2006); *see also Napue v. Illinois*, 360 U.S. 264, 269 (1959) (explaining "that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment"). Indeed, it is clearly established that "the failure of the prosecution to correct false testimony which it knows to be false violates due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Barham*, 595 F.2d 231, 232-33 (5th Cir. 1979). As the Supreme Court has held, the prosecution's "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972). "In order to prove that the State has violated the Fourteenth Amendment by relying on such testimony, the defendant must demonstrate: (1) that a witness for the State testified falsely; (2) that such testimony was material; and (3) that the prosecution knew that the testimony was false." *Knox v. Johnson*, 224 F.3d 470, 477 (5th Cir. 2000). This Court reviews this claim *de novo* because the Louisiana courts did not adjudicate the merits of Mr. Tsolainos's Due Process claim.[11]

[11] Mr. Tsolainos argued in his state petition for post-conviction relief that the use of perjured testimony at trial violated his due process rights. But the Louisiana Court of Appeal did not address this claim. On direct appeal, the Louisiana Court of Appeal adjudicated Mr.

1. The Trial Was Infected With False Testimony.

One of the State's principal witnesses—Clarissa Tsolainos—has admitted that her father's murder trial was infected with perjury in two critical respects. *First*, several witnesses, including Clarissa herself, have confirmed that Clarissa offered to pay George Deforrest to lie for her at the trial about a devastating statement that Mr. Tsolainos allegedly made on the day of the incident. Specifically, Mr. Deforrest testified at trial that Mr. Tsolainos said immediately after the incident that the "fucking bitch got what she deserved, she shouldn't have been running her fucking mouth off." Trial Tr. vol. V, 1215:30-31, Oct. 15, 1999 (testimony of Deforrest). The trial court found this to be the single most damaging piece of evidence offered at the trial.

It also happens to be demonstrably false. Two witnesses testified at a November 2001 hearing that Clarissa confessed that Mr. Deforrest lied at the criminal trial because she had offered financial incentives for his testimony. Cherie Breaux testified that Clarissa told her that Mr. Deforrest had lied on the stand because he had been bribed: "She said, George lied for me on the stand and I owe him $20,000 or a truck, and I haven't given it to him yet and he has been bugging me." First New Trial Hr'g Tr., 13:6-8, Nov. 26, 2001. David Showalter testified that he overheard Clarissa's statement to Cherie Breaux: "I overheard her saying that she had to pay George for a truck or give him a truck, a truck, because he lied for her in court." *Id.* at 20:6-20. A third witness, Patrick Pigrenet, stated that Clarissa admitted to him that Mr. Tsolainos never

---

Tsolainos's claim that the trial court abused its discretion by failing to grant a new trial based upon this newly discovered evidence of perjury. *Tsolainos*, 864 So. 2d 905, at *56-63. However, the requirements to establish a Due Process violation are different from Louisiana's statutory requirements for a new trial based on newly discovered evidence. *Compare Knox*, 224 F.3d at 477, *with State v. Watts*, 835 So. 2d 441, 447 (La. 2003) ("Thus, a new trial shall be granted based on Article 851(3) when: (1) new evidence was discovered after trial; (2) the new evidence is material; (3) the failure to discover the evidence was not due to a lack of diligence on the part of the defense; and, (4) had the evidence been introduced, the verdict or judgment of guilty probably would have been changed.").

made this statement to Mr. Deforrest: "After Panos hit, backed out of the driveway and then proceeded forward and ran into Debbie and Clarissa with the car that when he got out he didn't say that, that's good for you bitch, whatever." Transcript of Tape-Recorded Statement of Patrick Pigrenet to Ron Frazier at 2 (Nov. 14, 2001).

Although Clarissa initially denied that she had made these incriminating statements concerning her bribery of Mr. Deforrest, she later admitted to making them. Clarissa admitted promising to pay Mr. Deforrest for his testimony at the trial and confirmed that the respective testimonies of Cherie Breaux, David Showalter, and Patrick Pigrenet were accurate:

> Q. As I understand your testimony today, Clarissa, you now admit that you did tell George that you were going to either give him some money or buy him a truck. Irrespective of how you think he took it, you did make that statement, is that correct?
>
> A. Yes, sir.
>
> Q. So when you testified at the motion for new trial hearing on November 26th of 2001 that you absolutely unequivocally never made those statements and that all the people who testified that you did were doing it because they were money hungry and two-faced and liars, that wasn't true either, was it?
>
> A. Some of it was. Some of it wasn't. Because some of them are money hungry, two-faced people, like the Bossiers.
>
> Q. But the statements that they said you made you in fact made, right?
>
> A. Apparently, yes.
>
> Q. So they were telling the truth about that? Whatever you may think of them irrespective of their testimony in court, when it came to what they testified to at the motion for new trial hearing on November 26th, 2001, when most people said they heard you make those statements about having to buy George a new truck or give him money, those statements were true, right?
>
> A. Yes, sir.
>
> Q. And when you said they weren't true that was a lie, correct?
>
> A. Yes, sir.

Q. When you made these statements about having to buy George a new truck or give him money, you made those statements both before and after the trial, is that correct, to George?

A. Yes, sir.

Q. And when I say the trial, so there is no misunderstanding, you made those statements both before your father's criminal trial and after your father's criminal trial; that is, that you had to either buy George a truck or give him money?

A. I had offered it.

Q. And everything that you said about the witnesses at the motion for new trial hearing, lying under oath when they said you made those statements, was not true, because you did in fact make them, is that correct?

A. Yes, sir.

Second New Trial Hr'g Tr., 17:29-19:8, Feb. 25, 2003.

*Second*, Clarissa unequivocally admitted that she and Mr. Deforrest lied at trial about Deborah Tsolainos's alcohol consumption on the day of the incident in a way that nullified the defense's theory of the case. Mr. Deforrest testified that Deborah did not drink any alcohol on the day of the incident:

Q. Now on Sunday, at any time prior to Debbie unfortunately being hit by the car, do you know if she had anything of an alcoholic nature to drink?

A. No, sir.

Q. That was a bad question. No, she didn't or, no, you don't know?

A. To my best knowledge, she didn't drink anything.

Q. How much of the time Sunday morning, until the time that this incident occurred, did you spend around Debbie herself?

A. All day.

Trial Tr. vol. V, 1224:1-11, Oct. 15, 1999 (testimony of Deforrest). Clarissa likewise testified that her mother had not been drinking on that day:

Q. Had your mom been drinking earlier that day?

A. I didn't see her, but I was in and out. She wouldn't – I know that if she had – she was drinking, she wouldn't have got in the car to get McDonald's. I would drove [sic] or George would have gotten it, you know. I mean, it was common sense. She just got the kids. She's not going to screw up.

Trial Tr. vol. V, 1277:15-21, Oct. 15, 1999 (testimony of Clarissa Tsolainos).

But Clarissa later admitted that she and Mr. Deforrest had lied on the stand: "I said my mother hadn't been drinking that day, when in fact she had been. She had become an alcoholic at the time, not on heroin, but she did drink a lot." Second New Trial Hr'g Tr., 11:4-6, Feb. 25, 2003. She further testified:

Q. Now, let me turn your attention also to the testimony that you gave at the trial about your mother's alcohol consumption on the day of the trial, on the day of her death. She had been drinking quite a bit that day, isn't that correct?

A. Yes, sir.

Q. And, in fact, it's also true, is it not, that your mother had substituted alcohol for drugs and was a serious alcoholic both in St. Louis and when she came down here for the hearing regarding child custody, is that correct?

* * *

Q. Isn't that correct, Clarissa?

A. Yes, sir.

Q. And I believe you, in our conversations, described your mother as having eight, nine beers during the day at least when she died, is that correct?

A. Yes, sir.

Q. Yet you testified at the trial that she had not been drinking at all after she got home at two a.m. in the morning, is that correct?

A. Yes, sir.

Q. And that was a lie?

A. Yes, sir.

* * *

Q. Was George there when she started drinking?

A. Yes, and George.

Q. So George would have seen her drinking that day?

A. Yes, sir.

Second New Trial Hr'g Tr., 19:9-20:31, Feb. 25, 2003.

2. The False Testimony Was Material.

This false testimony was material because there is a "reasonable likelihood" that the perjury affected the jury's verdict. *Barham*, 595 F.2d at 242 (quoting *Giglio*, 405 U.S. at 154); *see also Barrientes v. Johnson*, 221 F.3d 741, 756 (5th Cir. 2000) ("In adjudicating a claim involving the use of false testimony, the 'any reasonable likelihood' standard has been applied to determine materiality."). "[T]his 'reasonable likelihood' standard of materiality is a 'low threshold' standard." *Barham*, 595 F.2d at 242. Here, the "reasonable likelihood" standard should be easily satisfied as the perjured testimony materially undermined the defense's theory of the case. Indeed, in light of the fact that the jury convicted Mr. Tsolainos with the bare minimum number of votes needed to convict in Louisiana (10-2), there can be no question that the "low threshold" materiality standard is met here.

*First*, Mr. Deforrest's testimony—that Mr. Tsolainos said "the fucking bitch got what she deserved"—was, in the trial court's view, the single most damaging piece of evidence against Mr. Tsolainos. When denying Mr. Tsolainos's motion for a new trial, the trial court commented: "The court would observe that the trier of facts could come to a decision almost on that statement alone." First New Trial Hr'g Tr., 134:15-18, Nov. 26, 2001. The trial court elaborated: "[P]erhaps the most damaging testimony or piece of evidence that came forward was the statement that George Deforest said that the defendant made after he climbed out of the

automobile and walked around and made that statement that is in the record." Second New Trial Hr'g Tr., 75:17-23, Feb. 26, 2003.

The impact of this evidence on the jury was exacerbated because the prosecutor "actually capitalized on it by referring to it" in both his opening and closing statements. *Barham*, 595 F.2d at 242; *see also Gonzales*, 436 F.3d at 580 ("This rule also applies to false statements made during the prosecutors rebuttal closing."). The prosecutor argued during his opening statement that, even if the jury remained unconvinced that Mr. Tsolainos had the specific intent to kill by the conspiracy evidence, "then maybe what George Deforrest heard him say when he's trying to save Debbie Tsolainos on the ground and Mr. Tsolainos is walking around the vehicle, George hears him say, 'Fucking bitch deserved to die for running her mouth.' Accident?" Trial Tr. vol. IV, 1116:6-12, Oct. 14, 1999. And during his closing statement, the prosecutor again focused the jury's attention on Mr. Tsolainos's alleged statement:

> And finally, when being placed in a position where nobody thinks they can hear him, George Deforrest is frantically trying to get the car off of Debbie, George Deforrest, back there (indicating), no reason in the world to lie, although Sterns (sic) calls him a liar. He has no reason to lie, and he comes to court and he says, I was fond of Debbie and I was fond of Panos, but I heard Panos say, "The fucking bitch deserved to die for running her fucking mouth."
>
> Those words sting. And I'm sorry I have to repeat them. But as Debbie Tsolainos was gasping for her last breath underneath a 3,300-pound car, the last thing she needed to hear was Panos Tsolainos expressing what his intent was, to kill her, in such a vulgar, unmistakable and unforgettable way.
>
> Let those words that Panos Tsolainos said on July 19th haunt him for the rest of his life, the way they haunt George Deforrest. Let those words, which is the epithet that Panos Tsolainos wrote for Debbie Tsolainos, be your guide to show that, in fact, he had specific intent to kill her, on July 19th, 1998. Let those words ring in your mind when you are in the back room deliberating this case.
>
> Every time somebody mentions manslaughter, let those words ring through your mind. It is not manslaughter, because he never says it was intentional. He never says he was angry. It can't be manslaughter. He wants you to think that it is negligent homicide. And the Judge is going to tell you, negligent homicide translates into a not guilty.

Trial Tr. vol. XI, 2254:10-2255:11, Oct. 23, 1999. No other witness overheard Mr. Tsolainos make this statement. Accordingly, without Mr. Deforrest's perjured testimony, the prosecution would have been without its "most damaging testimony or piece of evidence," and the jury's verdict would have unquestionably been affected.

The verdict also would likely have been affected if the jury had known that Mr. Deforrest's testimony was influenced by Clarissa's promises of financial gain because the jurors would have seriously doubted his credibility. *See United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997) ("False testimony for these purposes includes testimony that affects only the credibility of a witness."). Knowing that Mr. Deforrest had been bribed "would have given the jury a concrete reason to believe that [he] might have fabricated testimony in order to" curry favor with Clarissa. *Barham*, 595 F.2d at 243. Under such circumstances, "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Id.* at 242 (quoting *Napue*, 360 U.S. at 269). The State, therefore, violated Mr. Tsolainos's entitlement "to a jury that, before deciding which story to credit, was truthfully apprised of any possible interest of any Government witness in testifying falsely." *Id.* at 243; *see also United States v. Mason*, 293 F.3d 826, 829 (5th Cir. 2002) (holding that the defense was "prevented from effectively cross-examining the government's most important" witness and that "the jury was unable to properly evaluate" witness' testimony).

*Second*, the false testimony about Deborah's alcohol consumption was material because it solidified for the jury that the victim was not the aggressor and that Mr. Tsolainos had acted with specific intent to kill. The defense argued that Deborah, a former heroin addict, had substituted

alcohol for her drug dependency, that she was inebriated on the day of the incident, and that this had caused her to become enraged and aggressive. The false testimony undermined the defense's argument, making it more plausible for the jury to believe that Mr. Tsolainos's behavior was unprovoked and that, as the prosecution argued at trial, Deborah's elevated blood-alcohol level had been caused by heat from the undercarriage of the car. Trial Tr. vol. VII, 1720:16-1721:22, Oct. 18, 1999 (testimony of George).

3. <u>The Prosecution Knew or Should Have Known of the False Testimony.</u>

The final requirement—that the prosecution "knew or should have known" of the false testimony—is also satisfied. *Chambers v. Johnson*, 218 F.3d 360, 364 (5th Cir. 2000); *see also Jackson v. Brown*, 513 F.3d 1057, 1075 (9th Cir. 2008). Traditionally, the "should have known standard" requires a showing of mere negligence. *See United States v. Bader*, 956 F.2d 708, 710 (7th Cir. 1992) ("'Should have known' is closer to negligence than to knowledge."). Here, the prosecution should have know that it was using perjured testimony to convict Mr. Tsolainos for several reasons.

Foremost, the prosecution should have been alerted to the perjury concerning Deborah's alcohol use because it knew her blood-alcohol level of .07 indicated "approximately four or five beers" within an hour of Deborah's death. Trial Tr. vol. V, 1346:10-18, 1351:18-19, Oct. 15, 1999 (testimony of Mackenzie). The prosecution nevertheless stood silent when both Clarissa and Mr. Deforrest took the stand to testify that Deborah had not been drinking on the day of the incident. Under these circumstances, there can be no question that the prosecutors should have known that the testimony was false.

Moreover, in light of Mr. Deforrest's implausible testimony concerning Deborah's alcohol consumption, the prosecution should have suspected—or at the very least investigated—whether he was lying with respect to the statement he attributed to Mr. Tsolainos immediately

following the incident. Indeed, "[w]hen a prosecutor suspects perjury, the prosecutor must at least investigate. The duty to act 'is not discharged by attempting to finesse the problem by pressing ahead without a diligent and good faith attempt to resolve it. A prosecutor cannot avoid this obligation by refusing to search for the truth and remaining willfully ignorant of the facts.'" *Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006) (quoting *N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1118 (9th Cir. 2001)); *see also Bowie*, 243 F.3d at 1118 (stating that a prosecutor's duty under *Napue* to correct false evidence and elicit the truth "requires [him] to act when put on notice of the real possibility of false testimony"). "This truth-seeking function cannot be fulfilled when the state, knowing that a witness may have perjured herself, proceeds without conducting an investigation to ensure that a new trial is not warranted." *Morris*, 447 F.3d at 744. "The duty to investigate flows from the 'constitutional obligation of the State and its representatives to collect potentially exculpatory evidence, to prevent fraud upon the court, and to elicit the truth.'" *Id.* (quoting *Bowie*, 243 F.3d at 1117). Although "put on notice of the real possibility of false testimony," the prosecution in this case apparently did nothing, "pressing ahead without a diligent and a good faith attempt to resolve it." *Bowie*, 243 F.3d at 1118.

And, although it does not appear that the prosecution was aware of Clarissa's financial promises to Mr. Deforrest, the Supreme Court has imputed knowledge to the prosecution for purposes of false testimony claims. *See, e.g.*, *Giglio*, 405 U.S. at 154 (prosecutor responsible for promise of immunity made to witness by another prosecutor even though he had no actual knowledge). The prosecution—and not Mr. Tsolainos—should suffer the consequences of Clarissa's bribery and subornation of Mr. Deforrest's perjury because a murder conviction and life sentence based on false testimony offend "rudimentary demands of justice." *Id.* at 153. At a bare minimum, this Court should conduct an evidentiary hearing to determine what the

prosecution knew or should have known at the time this false testimony was presented in light of the due process implications of a murder conviction and life sentence without the possibility of parole resting upon admittedly false testimony. *See Austin v. McKaskle*, 724 F.2d 1153, 1156 (5th Cir. 1984) (remanding for evidentiary hearing on whether prosecution failed to correct what it knew or should have known to be false or incorrect testimony).

### D. <u>The Admission of Testimony Concerning Prior Drug Use Violated Mr. Tsolainos's Fifth and Sixth Amendment Rights.</u>

The trial testimony of Drs. Salcedo and Thompson violated Mr. Tsolainos's clearly established Fifth and Sixth Amendment rights as announced by the Supreme Court nearly thirty years ago. In *Estelle v. Smith*, 451 U.S. 454 (1981), the Supreme Court held that a criminal defendant's Fifth and Sixth Amendment rights were implicated—and violated—based on inadequate disclosures to a criminal defendant and his counsel regarding the scope of a psychiatric examination and the use to which the results of that examination could be put.

The factual circumstances surrounding the psychiatric examination in *Estelle* are strikingly similar to those presented here. In both cases, the court ordered that a doctor examine the defendant to determine his competency to stand trial. 451 U.S. at 456-57. In both cases, the doctors never warned the defendant or his counsel that statements made in the examination could be used for any purpose other than to determine his competency to stand trial. In both cases, the doctor produced a report and delivered it to the court so that the judge could make a competency determination. In both cases, the defendant presented no insanity evidence during the guilt phase of the trial. *Id.* at 458. In *Estelle*, the defense called three lay witnesses to testify to the defendant's good character, and the state responded by calling the doctor who examined the defendant before trial—even though the doctor was not on the state's witness list—to testify that the defendant was a sociopath. *Id.* at 459-60. Similarly, in this case there was no insanity

evidence presented, nor any presentation on the issue of Mr. Tsolainos's drug use, until the prosecution, in an attempt to rebut testimony concerning Mr. Tsolainos's mental state at the time of the offense, sought to introduce the testimony of Drs. Thompson and Salcedo, who were not on the State's witness list.

Given that this case is identical to *Estelle* in all material respects, the Louisiana courts clearly erred in failing to find that Mr. Tsolainos's Fifth and Sixth Amendment rights were violated. Indeed, the constitutional error is so clear with respect to this issue that the writ should be granted even if deference were owed to the Louisiana courts. But because the issue was directly presented to the Louisiana courts, and because the Louisiana courts did not address it,[12] the deferential AEDPA standard of review does not apply and this Court considers the issue de novo. *Powell v. Quarterman*, 536 F.3d 325, 343 (5th Cir. 2008).

---

[12] Mr. Tsolainos argued on direct appeal that the trial court erred in admitting the testimony of Drs. Salcedo and Thompson because of their status as court-appointed experts and because neither Mr. Tsolainos nor his counsel were warned that Mr. Tsolainos's disclosures could be used against him as affirmative evidence of his guilt. The First Circuit determined only that Mr. Tsolainos had "tendered the issue of his mental state at the time of the incident," and that the testimony offered by Drs. Salcedo and Thompson concerning Mr. Tsolainos's "mental condition at the time of the offense and any factors that would have directly affected it is genuinely relevant to the issue tendered to the jury." *Tsolainos*, 864 So. 2d 905, at *55. The court did not address the propriety of court-appointed experts testifying to information provided by Mr. Tsolainos where neither he nor his counsel was warned about the use of such disclosures for purposes outside the Sanity Commission's limited mandate. Mr. Tsolainos again raised the argument in his state petition for post-conviction relief, specifically relying on *Estelle* and arguing that, had he known that the statements he made to Drs. Salcedo and Thompson could be used against him at trial, he never would have admitted past drug use to them, and that his Fifth and Sixth Amendment rights were violated for that reason. The First Circuit, in considering Mr. Tsolainos's petition, did not address this argument, apparently considering it to be duplicative of the claim raised on direct appeal and thus not appropriate for consideration at the post-conviction stage. *See Tsolainos*, 997 So. 2d at 47.

1. The Testimony of Doctors Thompson and Salcedo on the Issue of Mr. Tsolainos's History of Drug Use Violated His Fifth Amendment Rights.

As the Supreme Court explained in *Estelle*, the Fifth Amendment privilege against self-incrimination is "directly involved" when the prosecution "use[s] as evidence against [the defendant] the substance of his disclosures during the pretrial psychiatric examination." 451 U.S. at 464. That holding is directly applicable here. Although the examination in this case was ostensibly conducted for the "limited, neutral purpose of determining [the defendant's] competency to stand trial, . . . the results of that inquiry were used by the State for a much broader objective that was plainly adverse to [him]." *Id.* at 465; *see also Porter v. Estelle*, 709 F.2d 944, 950 (5th Cir. 1983) ("[S]tatements of an accused ordinarily may not be used against him . . . when obtained from him by an examining physician during a court-ordered mental examination for purposes of determining his competency to stand trial or his insanity at the time of the offense, in the absence of waiver of fifth amendment rights against self-incrimination[.]"). Prior to the examination, Mr. Tsolainos was not informed that by candidly responding to the doctors' questions, he could be providing evidence that the prosecution would use at trial. *Estelle*, 451 U.S. at 466 (finding objectionable the fact that the prosecution had "offered information obtained from the court-ordered competency examination as affirmative evidence," which were "made without an awareness that he was assisting the State's efforts" with respect to an issue "on which the State had the burden of proof beyond a reasonable doubt").

The Fifth Circuit has applied this rule broadly. In *Vanderbilt v. Collins*, 994 F.2d 189 (5th Cir. 1993), for example, the Fifth Circuit found that *Estelle* applies even where the *defendant*, rather than the court, requests the psychiatric evaluation and where the defendant knew that the prosecutor would receive a copy of the doctor's report. *Id.* at 197. As the Fifth Circuit explained, the decisive question is whether the defendant was warned of the particular

use to which the examination would be put before the defendant volunteered statements to the doctor in the examination. *Id.* at 197-98. If he was not, and the court admits the statements for an unwarned purpose, then the Fifth Amendment violation is complete. *Id.* In this circuit, the doctor's testimony at trial must hew closely to what the defendant understood would be at stake at the time of the evaluation; if the defendant understood that the purpose of the examination was only to determine competency to stand trial, it thus would violate the Fifth Amendment for the court to later allow the doctor to testify to any other issues. *Id.* at 198; *see also United States v. Leonard*, 609 F.2d 1163 (5th Cir. 1980).

Accordingly, if the prosecution desired to use the court-ordered psychiatric examination as a means of procuring evidence of his guilt, it was required to inform him that it intended to do so prior to the examination. *See Estelle*, 451 U.S. at 466-67. A warning that the interview would be "non-confidential" is simply not sufficient to put Mr. Tsolainos on notice that his statements could be used against him at trial on issues unrelated to competency to stand trial. This is especially true in light of the fact that Mr. Tsolainos was affirmatively informed that the examination was being conducted for that limited purpose and that the doctors conducting the examination would report their findings to the court—not to the prosecution. In short, there was simply no way Mr. Tsolainos could have anticipated that the prosecution would be entitled to use his statements against him at trial.[13]

Indeed, the Fifth Circuit recently granted a petitioner's habeas corpus petition where a psychiatrist testified at the penalty phase of the petitioner's trial regarding the petitioner's future

---

[13] In fact, the introduction of the evidence of drug use in this case was perhaps even more egregious than the use of psychological testimony on the question of "future dangerousness" in *Estelle*, where testimony from a psychiatrist on the defendant's sociopathic tendencies was arguably relevant and might reasonably have been anticipated; here, every doctor that testified at Mr. Tsolainos's trial believed that his prior drug use had *no relevance* to his mental state on the day of the incident.

dangerousness. There, as here, the petitioner had been warned that (1) the results of the examination were not confidential, and (2) the results of the examination would be sent to the court. *See Gardner v. Johnson*, 247 F.3d 551, 558 (5th Cir. 2001). The Court nevertheless concluded that, in order to comply with the Fifth Amendment, the defendant must be informed of the *specific purpose* to which information gleaned from the examination will be put; there, the court found that the Fifth Amendment required that the defendant be told that the results of the examination would be used to gather evidence necessary to decide whether, if convicted, the defendant should be sentenced to death. *Id.* General knowledge that the examination is not confidential and that the results will be given to a third party simply does not suffice to protect the defendant's rights.

Under *Estelle*, then, the State had at least two options available if it wanted to present evidence of Mr. Tsolainos's past drug use (assuming it was relevant at all, which all doctors in this case testified that it was not). First, it could have hired its own psychiatrist or psychologist for the purpose of rebutting Mr. Tsolainos's expert testimony; in that instance, Mr. Tsolainos would have had fair notice that anything he said could be used against him by the prosecution. Second, the State could have made certain that Drs. Thompson and Salcedo warned Mr. Tsolainos that anything he said could be used against him by the prosecution for any legally relevant purpose. What the prosecution could not do, consistent with the Fifth Amendment, was use information elicited from Mr. Tsolainos, obtained by court-appointed doctors performing a limited function, without warning Mr. Tsolainos that he had the right to remain silent and that the information might be used against him for a specific purpose. Neither the Supreme Court nor the Fifth Circuit has ever condoned the use of neutral, court-appointed experts to fill voids in the prosecution's evidence where the prosecution, fully on notice of a defendant's intention to

introduce evidence of mental state, has chosen not to hire its own experts to examine the defendant and offer the proper warnings. Because the trial court allowed the prosecution to do just that in this case, Mr. Tsolainos's Fifth Amendment rights were violated and the petition should be granted.

2. The State's Failure to Provide Counsel With Notice of How the Examination of Mr. Tsolainos Would Be Used Violated Mr. Tsolainos's Sixth Amendment Rights.

These same facts also demonstrate that Mr. Tsolainos's Sixth Amendment right to the assistance of counsel was violated by the introduction of this damaging testimony. The Supreme Court held in *Estelle* that, where a criminal defendant who has a Sixth Amendment right to counsel is subjected to a custodial interrogation such as a pretrial psychiatric examination, the defendant's counsel must be in a position to provide the defendant with meaningful assistance. 451 U.S. at 469. The Supreme Court found that the defendant's right to counsel in that case had already attached when a court-appointed psychiatrist examined him while incarcerated, and that the interview, which was to determine the defendant's capacity to assist in his defense, was a "critical stage" of the criminal proceeding. *Id.* at 470. To satisfy the Sixth Amendment, then, the defendant's attorney must be notified in advance that the examination will encompass the particular issue upon which the doctor later testifies at trial, and that the defendant must have an opportunity to consult with counsel about that issue. *Id.* at 470-71. Allowing consultation between the defendant and his attorney on the potential ramifications of the psychiatric examination is of significant importance: because a "layman may not be aware of the precise scope, the nuances, and the boundaries of his Fifth Amendment privilege," *id.* at 471 (quoting *Maness v. Meyers*, 419 U.S. 449, 466 (1975)), a criminal defendant needs advice of counsel "in making the significant decision of whether to submit to the examination" based on "what end the

psychiatrist's findings could be employed," *id.*; *see also Powell v. Texas*, 492 U.S. 680, 681-82 (1989); *Vanderbilt*, 994 F.2d at 198.

These fundamental safeguards were not observed in this case. Mr. Tsolainos's counsel knew that the scope of the doctors' examinations would encompass Mr. Tsolainos's capacity to stand trial and, eventually, the *M'Naughten* standard, and that these doctors would report their findings to the court. However, counsel was never made aware prior to the prosecution's proffer of testimony from Drs. Salcedo and Thompson that it planned to call these doctors as witnesses for the prosecution on the subject of Mr. Tsolainos's history of drug use—a history that those same doctors acknowledged was unrelated to any of the purposes for which they examined Mr. Tsolainos. As a consequence, Mr. Tsolainos was deprived of the ability to consult with his counsel on the issue of whether to submit to an examination conducted by Drs. Salcedo and Thompson and, in turn, the ability to determine whether and under what conditions to disclose facts that could be used against him at trial. This violation of Mr. Tsolainos's Sixth Amendment rights requires that the Court grant the writ.

### E. <u>The Cumulative Impact of the Trial Court's Errors Deprived Mr. Tsolainos of His Due Process Right to a Fair Trial.</u>

"[F]ederal habeas relief may issue if a defendant was denied fourteenth amendment due process by the cumulative effect of errors committed in a state trial, which together deny fundamental fairness." *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992) (en banc); *see also United States v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004). A conviction should be overturned on federal habeas review for cumulative error where "(1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'" *Derden*, 978 F.2d at 1454. "In those cases where the

government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (finding cumulative error warranted reversal of conviction where "the evidence against the defendant was not overwhelming and that the case was a close one"). There is no question that each of the claims for relief set forth in this federal habeas petition are of "constitutional dimension" and that none have been procedurally defaulted.[14]

Thus, the pertinent question is whether the series of constitutional errors identified above "'so infected the entire trial that the resulting conviction violates due process.'" *Derden*, 978 F.2d at 1454. There is overwhelming evidence that they did. From the start, the entire trial was infected with constitutional error because the trial court allowed Mr. Tsolainos's guilt to be determined by a biased jury that had been saturated with overwhelmingly negative pretrial publicity. *See supra* at 57-64. The jury was then persuaded to convict Mr. Tsolainos based on the admittedly false testimony of two key witnesses—Clarissa Tsolainos and George Deforrest—and the out-of-court testimony of a dead confidential informant, Charles Schmolke, who was working for the Sheriff's Office on the belief that he would be paid for "results." *Id.* at 68-78, 44-56. And, for no apparent purpose other than to attack Mr. Tsolainos's character, the trial court allowed two court-appointed psychiatrists to testify about Mr. Tsolainos's past drug use despite the fact that the information was obtained in a court-mandated evaluation that was held

---

[14] Although Mr. Tsolainos exhausted each of his constitutional claims, he did not specifically make a cumulative error claim in the Louisiana courts. This Court may nevertheless consider this claim because exhaustion would have been futile. *See Morris v. Dretke*, 413 F.3d 484, 492 (5th Cir. 2005) (recognizing that "'exhaustion is not required if it would plainly be futile'"). Because the Louisiana courts found no constitutional error in this case, "there is 'nothing to cumulate'" for purposes of a cumulative error claim. *Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007); *see also United States v. Stalnaker*, 571 F.3d 428, 435 (5th Cir. 2009) ("[W]here 'we find no merit to any of [the defendant's] arguments of error, his claim of cumulative error must also fail.'").

for the limited purpose of determining his mental competency to stand trial. *Id.* at 78-84. And, even with this evidence, the State only convicted Mr. Tsolainos by obtaining the minimum non-unanimous jury verdict (10-2) permitted by Louisiana law.

Reviewing the record as a whole, then, these "errors more likely than not caused a suspect verdict" because it would have been nearly impossible for a fair and impartial jury to convict Mr. Tsolainos of intentionally killing his ex-wife. *Derden*, 978 F.2d at 1458. "[T]he cumulative impact of these errors goes to the heart of the prosecution's theory of the case and undermines every important element of proof offered by the prosecution against" Mr. Tsolainos. *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003). Without Mr. Schmolke's testimony, the State's evidence that Mr. Tsolainos participated in a conspiracy to kill his ex-wife would have been left in shambles. *See supra* at 57. And most damaging of all according to the trial court, Mr. Deforrest testified falsely that Mr. Tsolainos announced that Deborah Tsolainos "got what she deserved." Put simply, the State's principal evidence of intent to kill—testimony from Clarissa Tsolainos, George Deforrest, and Charles Schmolke—was either infected by perjury or should never have been introduced in the first place. "[I]f ever there were a case for application of cumulative error principles, this is it. The collective presence of these errors is devastating to one's confidence in the reliability of this verdict and therefore requires, at the very least, a new trial." *Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002).

### F. Conviction by a 10-2 Verdict Violated Mr. Tsolainos's Sixth Amendment Right to a Unanimous Verdict in a Criminal Trial.

The State violated Mr. Tsolainos's Sixth Amendment rights by convicting him of second-degree murder without a unanimous verdict. As noted above, Mr. Tsolainos was convicted by a vote of 10-2, the minimum required under the Louisiana Constitution. *See* Trial Tr. vol. XI, 2277:6-2279:18, Oct. 23, 1999. Louisiana remains one of only two states (along with Oregon)

that continue to allow a criminal conviction with less than a unanimous verdict. *See* La. Const. art. I, § 17; Or. Const. art. I, § 11. In a fractured decision, the Supreme Court held that although the Constitution required verdicts in federal criminal trials to be unanimous, that aspect of the Sixth Amendment was not incorporated against the States. *See Johnson v. Louisiana*, 406 U.S. 366, 369-80 (1972) (Powell, J., concurring in the judgment in *Apodaca v. Oregon*, 406 U.S. 404 (1972)). However, recent Supreme Court rulings cast significant doubt on the continued validity of that decision.[15]

Last Term, the Supreme Court reaffirmed that "incorporated Bill of Rights protections are *all* to be enforced against the States under the Fourteenth Amendment *according to the same standards* that protect those personal rights against federal encroachment." *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3035 (2010) (plurality opinion) (internal quotation marks omitted) (emphasis added); *see also id.* at 3058, 3064, 3068 (Thomas, J., concurring in the judgment). Given that the Sixth Amendment requires a unanimous jury verdict in federal criminal trials, *see Andres v. United States*, 333 U.S. 740, 748-49 (1948); *Hawaii v. Mankichi*, 190 U.S. 197, 211-12 (1903), it follows that this same constitutional standard also must apply to state criminal proceedings. Indeed, *Apodaca*'s two-tiered approach to the Sixth Amendment right to a

---

[15] Mr. Tsolainos did not raise this argument in his state post-conviction petition. However, this claim falls comfortably within the "futility" exception to AEDPA's exhaustion requirement. *See Morris*, 413 F.3d at 492. In particular, it would have been futile to ask the Louisiana courts to overrule *Apodaca* as only the Supreme Court can overturn its own decisions. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989); *Agostini v. Felton*, 521 U.S. 203, 237 (1997). As the Louisiana Supreme Court recently made clear, it is "not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court's still valid determination [in *Apodaca*] . . . may someday be overturned." *State v. Bertrand,* 6 So. 3d 738, 743 (La. 2009). Mr. Tsolainos has brought this claim, therefore, to preserve the issue for appellate review, *see In re Liljeberg Enters., Inc.*, 304 F.3d 410, 427 n.29 (5th Cir. 2002) ("[A]rguments not raised in the district court cannot be asserted for the first time on appeal."), and to ensure that he may benefit from any appellate decision on this question that is issued while this petition is pending, *see* Petition for a Writ of Certiorari, *Herrera v. Oregon*, No. 10-1344 (U.S. Sept. 9, 2010).

unanimous jury verdict in criminal cases is precisely the kind of "watered-down" incorporation of a Bill of Rights guarantee that the Court condemned in *McDonald*. 130 S. Ct. at 3035 (quoting *Malloy v. Hogan*, 378 U.S. 1, 10-11 (1964)); *see also id.* ("[I]t would be 'incongruous' to apply different standards 'depending on whether the claim was asserted in a state or federal court'"). Because *Apodaca* no longer remains good law after *McDonald*, Mr. Tsolainos's conviction by a non-unanimous jury violated the Sixth Amendment.

## V. RELIEF REQUESTED

Mr. Tsolainos respectfully requests that this Court order Respondent to show cause why the writ should not be granted and thereafter grant the petition, vacate the conviction, and order Respondent to release Mr. Tsolainos from custody.

Respectfully submitted on behalf of Mr. Tsolainos under penalty of perjury,

s/ Robert C. Stern

______________________________

Robert C. Stern (#12454)
*Trial Attorney*
Killeen & Stern, PC
400 Poydras Street, Suite 1710
New Orleans, Louisiana 70130
TEL: 504.525.8111
FAX: 504.680.6080

Andrew G. McBride
William S. Consovoy
Brendan J. Morrissey
Brett A. Shumate
Wiley Rein LLP
1776 K Street, N.W.
Washington, DC 20006
TEL: 202.719.7000
FAX: 202.719.7049

Dated: October 8, 2010

*Attorneys for Panos Tsolainos*